# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
)
UNITED STATES ASSOCIATION )
OF REPTILE KEEPERS, INC., et al. )
)
    Plaintiffs, )
)    Case No. 1:13-cv-02007-RDM
v. )
)
THE HONORABLE SALLY JEWELL, et al. )
)
    Defendants. )
_____ )
)

## PROPOSED *AMICUS CURIAE* BRIEF OF THE HUMANE SOCIETY OF THE UNITED STATES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

Dated: April 6, 2015

Respectfully submitted,

___s/ Anna Frostic_____
Anna Frostic (D.C. Bar No. 977732)
Ralph Henry (D.C. Bar No. 982586)
The Humane Society of the United States
2100 L Street NW Washington, D.C. 20037
Phone (202) 676-2333 Fax (202) 676-2357
Attorneys for *Amicus Curiae*
The Humane Society of the United State

## **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ....................................................................................................1

II.  INTERESTS OF AMICUS CURIAE.......................................................................2

III.  BACKGROUND .....................................................................................................2

IV.  ARGUMENT ...........................................................................................................6

V.  CONCLUSION.......................................................................................................17

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Andrus v. Allard*, 444 U.S. 51 (1979) ........................................................................9

*Attorney General of New York v. Soto-Lopez*, 476 U.S. 898 (1986) ...........................10

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006)......................12

*Chevron USA, Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984) ....................7, 8

*City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432 (1985) ...................................11

*Clark v. Martinez*, 542 U.S. 371 (2005) .......................................................................11

*F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307 (1993) .......................................................11

*Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) ...........................................................6

*Kornman v. S.E.C.*, 592 F.3d 173 (D.C. Cir 2010) .........................................................8

*Mazurek v. Armstrong*, 520 U.S. 968 (1997)................................................................6

*Monument Realty LLC v. Wash. Metro Area Transit Auth.*, 540 F. Supp. 2d 66 (D.D.C. 2008) ..12

*Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702 (D.C. Cir. 2008)...............................................11

*Nicchia v. People of State of New York*, 254 U.S. 228 (1920).......................................................9

*Pharm. Research & Mfrs. of Am. v. Thompson,* 251 F.3d 219 (D.C.Cir.2001)............................8

*Sentell v. New Orleans & C.R. Co.*, 166 U.S. 698 (1897) ............................................................9

*Sibley v. Obama*, 810 F. Supp. 2d 309 (D.D.C. 2011).....................................................6

*Smith v. Henderson*, 944 F. Supp. 2d 89 (D.D.C. 2013)...................................................6

*State of Kan. v. U.S.*, 16 F.3d 436 (D.C. Cir. 1994)........................................................9

*State v. Peters*, 534 So.2d 760 (Fla. 3d DCA 1988) ....................................................11

*State v. Schuler*, 1997 WL 76337 (Minn. App. Feb. 25, 1997) ...................................................11

*U.S. v. Brockdorff,* 992 F. Supp. 22 (D.D.C. 1997)........................................................9

*U.S. v. Castleman,* 134 S.Ct. 1405 (2014) ...................................................................11

*Wilkins v. Daniels*, 913 F. Supp. 2d 517 (S.D. Ohio 2012), *aff'd* 744 F.3d 409 (6th Cir. 2014) ....9

**Statutes**                                                                                    **Page(s)**

7 U.S.C. § 2132(g) ...............................................................................................15

16 U.S.C. §§ 1531 *et seq*........................................................................................13

16 U.S.C. § 1538(a)(1)(E)........................................................................................10

16 U.S.C. § 3372(a)(2)(C) ......................................................................................10

18 U.S.C. § 42(a) .............................................................................................4, 8

31 Stat. 187 (1900).................................................................................................3

**Other Authorities**                                                                           **Page(s)**

50 C.F.R. §§ 16.1 *et seq*.........................................................................................4

50 C.F.R. § 16.3 ....................................................................................................4

50 C.F.R. §§16.11 *et seq*.......................................................................................10

50 C.F.R. § 16.22 ..........................................................................................4, 12, 13

50 C.F.R. § 17.11 .................................................................................................13

75 Fed. Reg. 11808 (March 12, 2010) ...................................................................3, 5

77 Fed. Reg. 3330 (Jan. 23, 2012) (codified at 50 C.F.R. § 16.15)...........................5

79 Fed. Reg. 35,719 (June 24, 2014) ......................................................................5

80 Fed. Reg. 12702 (March 10, 2015) .....................................................................5

136 Cong. Rec. H8492-02, 1990 WL 142212 (Oct. 1, 1990)......................................4

H.R. Rep. 112-691, Sept. 28, 2012 ..........................................................................8

Senate Report 111-181, May 5, 2010 ...................................................................4, 8

## I.      INTRODUCTION

This litigation concerns the U.S. Fish and Wildlife Service's ("the Service's") decision to limit the import of and interstate commerce in eight species of large constrictor snakes, including anacondas and pythons that grow to over 20 feet in length. Plaintiffs challenge this regulation in order to maximize their profits through continued unfettered breeding and sale of these dangerous exotic pets. But the exotic pet trade has severe negative impacts on snake welfare and conservation, and federal law clearly authorizes restrictions on such trade in order to protect human health and safety, agricultural interests, and native ecosystems that can be destroyed by the escape or release of these non-native predators.

This case has critical implications for the future of the nation's oldest wildlife law, the Lacey Act, as a tool to promote the conservation of native wildlife.  While *amicus curiae* The Humane Society of the United States (HSUS) advocated for an even more restrictive regulation, the agency's rulemaking balanced all of the interests and resulted in reasonable regulations. Overturning the government's well-reasoned decision to limit imports of and interstate commerce in these large constrictor snakes to qualified facilities would result in unnecessary animal suffering, threaten public safety, and undermine conservation efforts.  And granting Plaintiffs' extraordinary request for emergency injunctive relief would very likely exacerbate the problems addressed by this policy, as any delay in enforcement could result in a flood of imports, breeding, and sale of these snakes.

Because the Lacey Act clearly gives the Service the authority to regulate the interstate transport of large constrictor snakes, and because Plaintiffs' financial harms are not irreparable and do not outweigh the animal welfare and environmental harms caused by the lack of regulation, HSUS respectfully requests that this Court deny Plaintiffs' motion for a temporary restraining order or preliminary injunction.

## II.      INTERESTS OF *AMICUS CURIAE*

As explained in its motion for leave to participate as *amicus curiae* and supporting Declaration, HSUS is a non-profit organization that works to promote the conservation and welfare of animals.  HSUS has significant interest in ensuring that the Service appropriately interprets and applies the statutory and regulatory provisions of the Lacey Act to effectuate congressional intent to conserve native ecosystems, prevent the introduction of invasive species, and protect human health and safety from species deemed injurious.  HSUS also would be adversely affected by a delay in the effective date of the regulation, as the organization would have to divert resources to try to combat the inundation of imports of and interstate commerce in the four species of large constrictor snakes at issue in the injurious listing rule ("Rule"). *See* Declaration of Nicole Paquette ("Paquette Decl.").

## III.     BACKGROUND

### The Large Constrictor Snake Trade

Snakes that kill their prey through constriction – including some of the largest snake species in the world that reach lengths exceeding 20 feet – are referred to as constrictor snakes. These snakes can live in a variety of habitats and can survive a wide range of temperatures.  Constrictor snakes are predators that eat a variety of mammals, birds, and other reptiles and hunt both on the ground and in trees. These snakes grow rapidly and can produce hundreds of offspring over a lifetime of a decade or more. The reticulated python alone, one of the species at issue in the Rule, can produce 124 eggs in a single clutch. Paquette Decl. ¶ 14.

The risks associated with the import of and interstate commerce in species of constrictor snakes that are not native to the U.S. – including the Indian or Burmese python, reticulated python, Northern African python, Southern African python, boa constrictor, green anaconda,

yellow anaconda, DeSchauense's anaconda, and the Beni anaconda – are well-established. When these top predators are introduced into new ecosystems, they have the power to decimate native wildlife (from raccoons to bobcats), which has not evolved to evade giant snakes. *See* 75 Fed. Reg. 11808 (March 12, 2010); Paquette Decl. ¶ 13.

The U.S. is currently facing an epidemic of unqualified individuals and facilities possessing, breeding, buying, selling, transporting, and exploiting dangerous exotic animals, including many threatened and endangered species. Paquette Decl., ¶7. Large constrictor snakes in the exotic pet trade suffer from inadequate care and are often abandoned when they grow to unmanageable lengths (as their specialized needs are exceedingly difficult to meet in captivity). Paquette Decl. ¶¶ 11-12. Snakes can carry Salmonella and other pathogens that cause zoonotic diseases and are unsafe to maintain in residential areas (indeed, 17 people have died from incidents involving large constrictor snakes since 1978). *Id.* ¶ 17. Further, commercial trade of captive-bred wildlife often negatively impacts efforts to conserve wild populations by decreasing public awareness about the plight of the species and potentially contributing to illegal wildlife trade. *See* Paquette Decl. ¶ 10. Despite these risks, Plaintiff the United States Association of Reptile Keepers (USARK) expends substantial resources to promote the private ownership of snakes like anacondas and pythons and to protect the profits of its members who breed and sell snakes.

**Legal Framework**

The Lacey Act is the nation's oldest wildlife protection law, originally enacted in 1900 (31 Stat. 187 (1900)). The Lacey Act has been amended several times in the past century, and since 1960 has authorized the Secretary of the Interior to prohibit the "importation into the United States . . . or any shipment between the continental United States, the District of Columbia, Hawaii, the Commonwealth of Puerto Rico, or any possession of the United States" of any

wildlife that is "injurious to human beings, to the interests of agriculture, horticulture, forestry, or to wildlife or the wildlife resources of the United States . . . ." 18 U.S.C. § 42(a)(1).

In addition to providing such regulatory authority, Congress itself has statutorily identified several wildlife species as injurious, including mongoose, fruit bats, zebra mussels, and bighead carp. *Id*. Congress' most recent additions to this list (zebra mussels and bighead carp) demonstrate that Congress intends the Lacey Act to regulate the shipment of injurious species over state lines ***within the continental U.S.*** (as well as importation into the U.S. and trade to non-contiguous U.S. states and territories). *See, e.g.,* 136 Cong. Rec. H8492-02, 1990 WL 142212 (Oct. 1, 1990) (recording debate in the House of Representatives on P.L. No. 101-646 and demonstrating that Congress listed zebra mussels as injurious in order to prevent their spread from the Great Lakes to the Mississippi River); Senate Report 111-181, May 5, 2010 (describing the objective of P.L. No. 111-307 as protecting the Great Lakes from the introduction of bighead carp from the Mississippi watershed by including the species on "the list of injurious species that are prohibited from being ***traded in interstate commerce*** or imported into the United States." (emphasis added)).

The Fish and Wildlife Service has adopted regulations to implement this law (50 C.F.R. §§ 16.1 *et seq.*), providing that importation or transportation of injurious wildlife is generally prohibited, subject to certain exceptions. *Id.* § 16.3. Injurious wildlife permits authorize otherwise prohibited activities for zoological, educational, medical, or scientific purposes. *Id.* § 16.22. Thus, an injurious listing aims to eliminate trade in invasive species for use as exotic pets or other commercial purposes, while continuing to allow justifiable use of such species (e.g., for conservation measures or scientific research).

4

Pursuant to this authority, on March 12, 2010, the Service issued a Proposed Rule to add nine species of large constrictor snakes to the list of injurious wildlife under the Lacey Act. 75 Fed. Reg. 11,808 (March 12, 2010).  Finding that these nine species of snakes pose a significant risk of becoming established in the wild in the United States as invasive species, and potentially threatening native wildlife and costing the government millions of dollars to address, the rule proposed to prohibit the import and interstate transportation of the Indian python (including Burmese python), reticulated python, Northern African python, Southern African python, boa constrictor, green anaconda, yellow anaconda, DeSchauensee's anaconda, and Beni anaconda.

On January 23, 2012, the agency took a first step and restricted trade in four of the nine species identified as injurious: Indian pythons (including Burmese pythons), Northern African pythons, Southern African pythons, and yellow anacondas. 77 Fed. Reg. 3330 (Jan. 23, 2012) (codified at 50 C.F.R. § 16.15).  In June 2014, following the publication of additional scientific evidence of the risks large constrictor snakes pose to native ecosystems, the agency reopened the comment period on the 2010 proposed rule and reviewed substantial input from experts and the public (including those, unlike Plaintiffs, who do not have a vested financial interest in unregulated trade). 79 Fed. Reg. 35,719 (June 24, 2014). Then on March 10, 2015, the Service issued a final rule listing four more species of large constrictor snakes as injurious – the reticulated python, DeSchauensee's anaconda, green anaconda, and Beni anaconda. 80 Fed. Reg. 12702 (March 10, 2015).

Plaintiffs challenge both the 2012 and 2015 snake listings, and are seeking emergency injunctive relief to stall the implementation of the 2015 listing (though they have been on notice of such potential regulation since 2010).

## IV.    ARGUMENT

Plaintiffs have failed to meet their demanding burden to prove all of the elements required for the issuance of a temporary restraining order or preliminary injunction.  Injunctive relief pending judicial review is an extraordinary remedy, and should only be granted when the moving party, "by a clear showing, carries the burden of persuasion" on **all** elements. *Sibley v. Obama*, 810 F. Supp. 2d 309, 310 (D.D.C. 2011) (*quoting Mazurek v. Armstrong*, 520 U.S. 968 (1997)). In order for the Court to issue a temporary restraining order (or preliminary injunction), Plaintiffs must show that: (1) they have a substantial likelihood of success on the merits, (2) they would suffer irreparable injury if the injunction were not granted, (3) an injunction would not substantially injure other interested parties, and (4) the public interest would be furthered by the injunction. *Id. See also Smith v. Henderson*, 944 F. Supp. 2d 89, 96 (D.D.C. 2013); *Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (Plaintiffs must show that the "injury complained of is of such imminence that there is a 'clear and present' need for equitable relief").

But Plaintiffs are unlikely to succeed on the merits of their claims.  The implementation of the large constrictor snake rule as scheduled will not cause irreparable harm to Plaintiffs, a delay in enforcement would cause harm to Defendants and interested parties like HSUS, and the public interest is clearly in favor of denying this motion for preliminary relief. Thus, Plaintiffs' motion should be denied. The fact that Plaintiffs disagree with the policy at issue here (as they desire to continue to engage in the inhumane and risky interstate trade of large constrictor snakes, which can be sold for thousands of dollars each) is not a legitimate reason for stalling or overturning this reasonable regulation.

A.  <u>Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims</u>

Plaintiffs argue that they are likely to succeed on the merits of Counts One, Two, and Six of

their Second Amended Complaint (pertaining to the scope of the Lacey Act and the Regulatory

Flexibility Act), asserting that Counts Three, Four, and Five (pertaining to the National

Environmental Policy Act and the Administrative Procedure Act) cannot be decided before the

administrative record is produced.  This section will focus on Plaintiffs' argument that the

Service's regulations exceed the authority granted by the Lacey Act (Counts One and Two).

      i.    <u>Congressional Intent Is Clear that the Lacey Act Prohibits Transport of Injurious
Wildlife Over State Lines Within the Continental U.S.</u>

Plaintiffs' brief largely ignores the plain language of the act, and instead takes the Court

down a rabbit hole of legislative history going back over 100 years to try in support their strained

argument.  But the Supreme Court has made clear that in matters of statutory construction, courts

must ask first "whether Congress has directly spoken to the precise question at issue." *Chevron*

*USA, Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842 (1984).  If Congressional

intent is clear, "that is the end of the matter; for the court, as well as the agency, must give effect

to the unambiguously expressed intent of Congress." *Id*. at 842–43.  In the instant matter, this

Court can simply look to the current version of the law and recent Congressional action to be

confident that the agency has not exceeded its statutory authority in listing eight species of large

constrictor snakes as injurious.

The Lacey Act prohibits

> the ***importation into*** the United States, any territory of the United States, the
> District of Columbia, the Commonwealth of Puerto Rico, or any possession of the
> United States, or any ***shipment between*** the continental United States, the District
> of Columbia, Hawaii, the Commonwealth of Puerto Rico, or any possession of the
> United States, of the mongoose of the species Herpestes auropunctatus; of the

species of so-called "flying foxes" or fruit bats of the genus Pteropus; of the zebra mussel of the species Dreissena polymorpha; of the bighead carp of the species Hypophthalmichthys nobilis; *and such other species* of wild mammals, wild birds, fish (including mollusks and crustacea), amphibians, reptiles, brown tree snakes, or the offspring or eggs of any of the foregoing *which the Secretary of the Interior may prescribe by regulation to be injurious* to human beings, to the interests of agriculture, horticulture, forestry, or to wildlife or the wildlife resources of the United States...

18 U.S.C. § 42(a) (emphasis added).

In 2010, Congress amended this provision to add "big head carp of the species Hypophthalmichthys nobilis" to the statutory injurious species list, specifically to prohibit the movement of that invasive species from one part of the continental United States (the Mississippi River) to another part of the continental United States (the Great Lakes). *See* Senate Report 111-181 (May 5, 2010) (describing the objective of P.L. No. 111-307 as protecting the Great Lakes from the introduction of bighead carp from the Mississippi watershed by including the species on "the list of injurious species that are prohibited from being *traded in interstate commerce* or imported into the United States.") (emphasis added).[1]  This legislative history (disingenuously omitted by Plaintiffs) makes absolutely certain that Congress intends this provision of the Lacey Act to regulate the transport of injurious wildlife across state lines within the continental United States, in addition to prohibiting import into the continental United States. *See Pharm. Research & Mfrs. of Am. v. Thompson,* 251 F.3d 219, 224 (D.C.Cir.2001) (courts may use all "traditional tools of statutory interpretation," including "text, structure, purpose, and legislative history," to ascertain Congress's intent at *Chevron* step one); *Kornman v. S.E.C.*, (592 F.3d 173, 183-84

---

[1] Further, and also ignored by Plaintiffs, Congress itself considered legislation to add these large constrictor snakes to the statutory list of injurious species in order to prohibit movement of the species within the continental U.S. *See* H.R. Rep. 112-691, at 3 ("Section 42 currently prohibits the importation or *interstate shipment* of certain injurious animals" and "the U.S. Fish and Wildlife Service [] finalized a rule that bans the importation *and interstate transport* of four nonnative constrictor snakes…H.R. 511 includes these four species and five additional threatening species.") (emphasis added).

(D.C. Cir 2010) (noting that legislative history of congressional amendments to a statute may be used to make clear Congress' original and current intent as to how the statute should be interpreted).

Thus, Congress has explicitly approved of the Fish and Wildlife Service's use of the Lacey Act to regulate the movement of large constrictor snakes within the continental United States and Plaintiffs' claim that the Service's regulations are *ultra vires* is without merit.

### ii.   Plaintiffs Constitutional Arguments Are Groundless.

Plaintiffs' claim that the Service's reasonable limitation of trade in large constrictor snakes violates Plaintiffs' right to travel and the Equal Protection Clause is meritless. Animal ownership and use is not a fundamental constitutional right. Indeed, the strict regulation of large constrictor snakes has withstood direct constitutional challenge at the state level. *See Wilkins v. Daniels*, 913 F. Supp. 2d 517, 542 (S.D. Ohio, 2012), *aff'd* 744 F.3d 409 (6th Cir. 2014) (upholding Ohio's Dangerous Wild Animal and Restricted Snakes Act, finding that "exotic animals owned as personal property . . . are living creatures that pose unique threats to people, and thereby reasonably may be subject to onerous government regulation").[2]

The right to interstate travel is also not absolute. *See U.S. v. Brockdorff*, 992 F.Supp. 22 (D.D.C., 1997). "If the right to travel is implicated, it can only be because 'impeding travel is

_____

[2] *See also Andrus v. Allard*, 444 U.S. 51, 65-68 (1979) (upholding federal prohibition on the sale of eagle feathers, and noting that "government regulation – by definition – involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property. . . . It is true that appellees must bear the costs of these regulations. But, within limits, that is a burden borne to secure 'the advantage of living and doing business in a civilized community.'") (internal citations omitted); *Nicchia v. People of State of New York*, 254 U.S. 228, 230 (1920) ("Property in dogs is of an imperfect or qualified nature and they may be subjected to peculiar and drastic police regulations by the state without depriving their owners of any federal right."); *Sentell v. New Orleans & C.R. Co.*, 166 U.S. 698 (1897) (animals are "subject to the police power of the state, and might be destroyed or otherwise dealt with, as in the judgment of the legislature is necessary for the protection of its citizens.").

[the law's] primary objective' or 'it actually deters . . . travel.'" *State of Kan. v. U.S.*, 16 F.3d 436 (D.C. Cir. 1994) (*quoting Attorney General of New York v. Soto-Lopez*, 476 U.S. 898 (1986)). Fish and Wildlife Service's regulation of large constrictor snakes is obviously not designed to impede interstate travel by citizens – the whole purpose of the regulation is to limit the movement of snakes, not people. Further, the regulation does not actually deter interstate travel by citizens, as citizens remain free to travel among the states (although they may have to find qualified facilities to care for their snakes during the duration of their travel).

For this Court to hold otherwise would call into question the constitutionality of all of the Lacey Act statutes and regulations that restrict interstate commerce in certain animals, as well as similar provisions in the Endangered Species Act. *See* 50 C.F.R. §§16.11 *et seq.* (prohibiting interstate transport in certain mammals, birds, fish, mollusks, crustaceans, and amphibians); 16 U.S.C. § 3372(a)(2)(C) (prohibiting interstate transport of big cats); 16 U.S.C. § 1538(a)(1)(E) (prohibiting interstate transport of endangered species without a permit). As the Supreme Court has acknowledged, "something more than a negligible or minimal impact on the right to travel is required before strict scrutiny is applied." *Soto-Lopez*, 476 U.S. at 921. Plaintiffs have failed to show that the regulation on trade of dangerous exotic animals has more than a negligible impact on Plaintiffs' right to interstate travel and the agency regulation challenged here is rationally related to a legitimate government interest in promoting wildlife conservation.

Plaintiffs further claim, erroneously, that the large constrictor snake regulation implicates Equal Protection concerns.  The Supreme Court has repeatedly held that "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge

if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993).

Snake breeders and owners are not a protected class, and disparate treatment of such individuals is constitutional where, as here, there is a rational basis for the government's differential treatment (i.e., preventing the invasion of exotic snakes into native ecosystems). *See City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 440 (1985); *State v. Schuler*, 1997 WL 76337, at *2 (Minn. App. Feb. 25, 1997) (upholding municipal ordinance requiring citizens to only have three dogs per household as rationally related to controlling dog noise and odor); *State v. Peters*, 534 So.2d 760, 763 (Fla. 3d DCA 1988) (finding that Equal Protection does "not guarantee that all dog owners will be treated alike").

Accordingly, the Court's duty to avoid constitutional conflicts has no application here. The canon of constitutional avoidance directs courts to interpret a statute in a manner that preserves its validity; thus, courts do not give deference to agency interpretations that present *serious* constitutional difficulties. *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 711 (D.C. Cir. 2008). But there are no serious constitutional concerns raised by the injurious listings here,  nor are we dealing with an agency interpretation, but rather the plain language of the statute. *See also U.S. v. Castleman,* 134 S.Ct. 1405 (2014) (holding that Plaintiff "has not challenged the constitutionality [of the law] . . . either on its face or as applied to him, and the meaning of the statute is sufficiently clear that we need not indulge [Plaintiff's] cursory nod to constitutional avoidance concerns"); *Clark v. Martinez*, 542 U.S. 371 (2005) (the canon of constitutional avoidance "is not a method of adjudicating constitutional questions by other means").

Therefore, Plaintiffs are unlikely to succeed on the merits of Count One and Two from their second amended complaint.  As addressed by federal Defendants, Plaintiffs are also unlikely to

succeed on the merits of Count Six (regarding Regulatory Flexibility Act procedures).[3]  Thus,

Plaintiffs' motion for emergency injunctive relief should be denied.

   B.  Plaintiffs Cannot Demonstrate Irreparable Harm

   As Plaintiffs acknowledge, their burden is to prove that they would suffer certain and

significant harm, not theoretical or negligible harm, from the scheduled implementation of the

law. *See* Pls.' Br. at 36; *Monument Realty LLC v. Wash. Metro Area Transit Authority*, 540 F.

Supp. 2d 66, 74 (D.D.C. 2008). Plaintiffs have clearly failed to meet that burden.  Indeed,

Plaintiffs' own brief reveals that the primary impact of this regulation on Plaintiffs would be

financial, and thus, is not appropriately remedied by emergency injunctive relief. *See Chaplaincy*

*of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ("injuries, however,

substantial, in terms of money, time and energy necessarily expended in the absence of a stay are

not enough").

   Plaintiffs have also incorrectly identified the impacts the law will have.  The injurious listing

would not "impair vital bio-medical research" (Pls.' Br. at 42), as the regulations would

specifically allow continued trade in snakes for bona fide medical and scientific purposes. 50

C.F.R. § 16.22.  The Service may also issue permits for interstate transport of injurious species to

seek necessary medical treatment for such animals. *Id.* Similarly, the injurious listing would not

"hamper environmental education programs" (Pls.' Br. at 43), as the regulations allow for

permits for educational purposes. 50 C.F.R. § 16.22.  Nor would the injurious listing "deter

necessary conservation efforts" (Pls.' Br. at 43), as permits are issued for scientific and

---

[3] Additionally, although Plaintiffs have not even argued that they are likely to succeed on the merits of Counts Three, Four, and Five, the Service's decision to list eight large constrictor snakes as injurious is not arbitrary or capricious and is in accordance with the Lacey Act and the Administrative Procedure Act, and that the Service's decision to protect native ecosystems from exotic snakes was appropriately analyzed under the National Environmental Policy Act (which is designed in part to protect native ecosystems from invasive species).

zoological purposes (50 C.F.R. § 16.22), and since the Lacey Act does not supplant the

Endangered Species Act (which allows for conservation measures to protect endangered species

like Indian Pythons). 16 U.S.C. §§ 1531 *et seq.*; 50 C.F.R. § 17.11.

Plaintiffs are clearly challenging this regulation in an attempt to continue to make profits

from the business of selling dangerous snakes into the exotic pet trade.  While *amicus* HSUS

and many other animal welfare and conservation organizations oppose such activity, the

injurious listing would not prohibit Plaintiffs from continuing to breed large constrictor snakes

for personal use or for intrastate sale (or from breeding other snake species for interstate sale).

Thus, Plaintiffs' claim that the rule would threaten the existence of their businesses is patently

false, as there is nothing that prohibits Plaintiffs from adjusting their operations to account for

the new regulatory landscape (as businesses routinely do). That the injurious listing might make

Plaintiffs' business less profitable is not grounds for overturning  a lawfully promulgated rule or

for stalling its effective date.

Plaintiffs attempt to disguise the purely economic nature of their injury by arguing that the

rule would sever the emotional attachment Plaintiffs' allegedly have to captive snakes.  But the

rule would not prohibit continued possession of pet snakes or breeding stock, and if Plaintiffs

voluntarily euthanize snakes they can no longer sell for a profit that would be self-inflicted

injury.

Thus, Plaintiffs have failed to demonstrate that the scheduled implementation of the injurious

listing would cause them irreparable harm, and their motion for injunctive relief must be denied.

C.  Enjoining Implementation of the Large Constrictor Snake Rule Would Cause Harm to

   Defendants and the Public

Plaintiffs claim that the length of time it took the Service to develop the injurious snake listings is evidence that further delay would not cause harm to Defendants.  Pls.' Br. at 4, 33. However, the opposite is true.  The fact that multiple years have passed since the federal government formally recognized the threats posed by these invasive species counsels in favor of immediate action to remedy this problem.  Wildlife regulations routinely take multiple years for the Service to enact, but that does not minimize their importance.  Under Plaintiffs' theory, for example, the Service's ongoing delay in regulating the domestic trade in elephant ivory could be stayed indefinitely by ivory dealers (given the longstanding status quo of deregulation) despite the ongoing poaching crisis in Africa. Similarly, here it is critically important that the rule go into effect immediately to stop the import and interstate transport of large constrictor snakes to protect native wildlife, animal welfare, and human safety and aesthetic interests.

Further, granting Plaintiffs' motion would result in harm to interested parties like HSUS, and a multitude of other animal welfare and conservation organizations and advocates.[4] If the Court enjoined the rule from taking effect, it would likely prompt a flood of imports and interstate transport of large constrictor snakes, exacerbating the problem addressed by the rule and requiring law enforcement entities and animal rescue entities to divert resources to deal with the ramifications of such.  Paquette Decl. ¶ 20.

D.  The Public Interest Is Served By Timely Implementation of the Rule

Issuing a temporary restraining order delaying the implementation of the injurious snake rule is clearly contrary to the public interest, as it would continue to allow unfettered breeding and sale of dangerous snakes as exotic pets.

---

[4] Including Natural Resources Defense Council, Center for Biological Diversity, The Nature Conservancy, National Parks Conservation Association, American Society for the Prevention of Cruelty to Animals, International Fund for Animal Welfare, The Wildlife Society, Ecological Society of America, and National Environmental Coalition on Invasive Species.

The snake industry (and its corporate lobbying arm, the United States Association of Reptile Keepers), has severe negative impacts on animal welfare, conservation, and public safety. Paquette Decl. ¶ 7.  While many pet reptiles are bred in captivity, many are still taken from the wild, leaving behind depleted populations and damaged habitats. *Id.* ¶ 8.  Harsh capture techniques, compounded by poor shipping practices, kill many reptiles before they reach the pet store or dealer. *See id.* ¶¶ 8.

Reptile breeding operations commonly warehouse snakes in stacked plastic containers no larger than a shoe box. *Id.* ¶ 9.  These cheap, barren environments fail to mimic natural environments and prevent normal behaviors and movements, including the fundamental need to stretch out to full body length. *Id.* Currently, no federal agency regulates these snake breeding operations, as reptiles are exempt from the Animal Welfare Act. 7 U.S.C. ¶ 2132(g); Paquette Decl. ¶ 9.

Snake breeders, including those associated with USARK, selectively breed snakes to produce different colors and patterns, as these so-called "morphs" can be sold for higher prices.  Paquette Decl. ¶ 10.  Such breeding is inconsistent with sound conservation science principles – indeed, conservation professionals have found that breeding rare color morphs is linked to abnormal and debilitating conditions that compromise animal welfare and would likely fail to persist in the wild. *Id.*

Snakes are often taken home by families lured by the excitement of an allegedly "low maintenance" exotic pet, but who become overwhelmed by the level of care required, especially for snakes that grow over 8 feet in length (such as those species at issue in this case).  Paquette Decl., at ¶11.  Many snakes suffer as a result of ill-informed owners who lack knowledge of the

complex needs of these animals (including proper humidity, temperature, substrate, ultraviolet light exposure, and live prey).  *Id.*

Because of the difficulty and expense of providing for a large constrictor snake, many snakes are abandoned in urban areas, forests, and wetlands, where they either die from starvation, exposure, or predation or survive and compete with native wildlife for food and habitat, damaging the balance of the ecosystem.  *Id.* ¶12.  The enormously high reproductive capability of large constrictor snakes increases the likelihood of colonization and the escape of just one pregnant snake in a hospitable environment could be enough to establish a significant population. *Id.* ¶14.

Those who devote substantial recreational time viewing, enjoying, studying, and photographing native wildlife in parts of the United States that have been impacted by (or are at high risk of being impacted by) the invasion of exotic large constrictor snakes (such as Florida, Puerto Rico, and Hawaii), including HSUS members, are adversely affected by the lack of regulation of the import and interstate transport of large constrictor snakes. *Id.* ¶15.

Not only do escaped and released snakes invade native ecosystems, but they also pose a direct threat to human health and safety. *Id.* ¶16.  HSUS has tracked nearly 550 incidents in 46 states involving large constrictor snakes causing death or serious injury.  *Id.*  Seventeen people have died from large constrictor snake related incidents in the United States since 1978—12 just since 1990—including four babies squeezed to death while sleeping in their cribs.  *Id.*  Further, it is well established that snakes carry zoonotic diseases like Salmonella.  *Id.*

Thus, the public interest is served by immediately implementing restrictions on the import and interstate transport of large constrictor snakes, and issuing a temporary restraining order or

preliminary injunction delaying the enforcement of the injurious species listing would undermine the public's interest in animal welfare, wildlife conservation, enjoyment of native ecosystems, and human health and safety.

## V.    CONCLUSION

As discussed herein, Plaintiffs' claims are meritless and this Court should deny this motion for emergency injunctive relief.

Dated: April 6, 2015                                             Respectfully submitted,

                                                    ___s/ Anna Frostic_____
                                                    Anna Frostic (D.C. Bar No. 977732)
                                                    Ralph Henry (D.C. Bar No. 982586)
                                                    The Humane Society of the United States
                                                    2100 L Street NW Washington, DC 20037
                                                    Phone (202) 676-2333 Fax (202) 676-2357
                                                    Attorneys for *Amicus Curiae*

17