## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES ASSOCIATION OF REPTILE KEEPERS, INC., *et al.*, <br><br> Plaintiff, <br><br> - vs. - <br><br> THE HONORABLE SALLY JEWELL, *et al.*, <br><br> Defendants. | Civ. No.: 13-2007-RDM |

### PLAINTIFFS' BRIEF IN REPLY TO THE DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Dated: April 27, 2015                                Respectfully submitted,

Shaun M. Gehan                                       David E. Frulla
D.C. Bar No. 483720                                  D.C Bar No. 414170
The Law Office of Shaun M. Gehan, PLLC
3050 K Street, N.W. – Suite 400                      Paul C. Rosenthal
Washington, D.C. 20007                               D.C. Bar No. 235242
Telephone: (202) 342-8469                            Kelley Drye & Warren LLP
Facsimile: (202) 342-8451                            3050 K Street, N.W. – Suite 400
                                                     Washington, D.C. 20007
                                                     Telephone: (202) 342-8400
                                                     Facsimile: (202) 342-8451

                                                     *Attorneys for Plaintiffs*

In their Supplemental Memorandum, (Dkt. No. 44 (April 20, 2015)), Defendants the Honorable Sally Jewell and U.S. Fish and Wildlife Service (collectively "FWS") provide no new arguments that should convince this Court to deny Plaintiffs' application for preliminary injunctive relief.  While the Federal Government's interstate commerce power is capacious, an agency may only exercise such power as delegated by Congress, especially in the context of a criminal statute.  Defendants know very well how to ask Congress to amend the Lacey Act, as they did in 1935, 1960, and 1980.  Each time, FWS fully explained the changes sought and its rationale.  By contrast, the quasi-legislative flotsam and jetsam Defendants now present do not demonstrate that Congress was ever made aware that FWS had, *sub silento*, arrogated to itself a power to regulate interstate commerce the law did not provide, much less that Congress ratified FWS' "interpretation" the agency never furnished.  Rather than admitting the Lacey Act's jurisdictional limits to Congress and working to get them fixed, FWS instead tries to brazen it out.  (*See* Pl. Supp. Br. (Dkt. No. 45) at 21 & n.12 (April 20, 2015).)  This Court should reject Defendants' invitation to legislate from the bench.

I. **THERE IS NO STATUTE OF LIMITATIONS BAR TO THE COURT'S CONSIDERATION OF COUNTS ONE AND TWO**

FWS claims it "first provided its interpretation of the geographic scope of the prohibition on transportation in 18 U.S.C. § 42(a) on May 23, 1989 when it promulgated a regulation to list the mitten crab as an injurious species."  (Def. Supp. Mem. at 3 (citing 54 Fed. Reg. 22286, 22287).)  It did no such thing.  The referenced regulation states in full:

> By this Service action of adding the genus *Eriocheir* to the list of injurious fish, mollusks, and crustaceans in 50 CFR 16.13, their *acquisition, importation into, or transportation between the continental United States, the District of Columbia, Hawaii, the Commonwealth of Puerto Rico, or any territory or possession of the United States by any means whatsoever is prohibited* except by permit for zoological, educational, medical, or scientific purposes, or by Federal agencies without a permit solely for their own use

> upon filing a written declaration with the District Director of Customs at the port of entry. **In addition**, no live mitten crab, viable eggs, or progeny thereof acquired under permit may be sold, donated, traded, loaned, or transferred to any other person unless such person has a permit issued by the Director of the Service. The interstate transportation of any live mitten crabs or viable eggs thereof that currently may be held in the United States for purposes such as aquaculture propagation or for human consumption, or for any purpose not otherwise permitted, would be prohibited.

54 Fed. Reg. 22286, 22287 (May 23, 1989) (emphasis added). As the passage shows, FWS was not "interpreting" the statutory phrase "between the continental United States," but was rather creating an additional condition specific to the mitten crab listing.[1] *See also* 56 Fed. Reg. 56942, 56942 (Nov. 7, 1991) (using the exact same formulation for the zebra mussel).

Plaintiffs, moreover, raise substantive, applied challenges to the 2012 and 2015 rules. Jurisdictional or otherwise,[2] Section 2401(a)'s six-year limitations period does not apply to such challenges to agency regulations. *See Public Citizen v. Nuclear Regulatory Comm'n*, 901 F.2d 147, 152 n.1 (D.C. Cir. 1990) (contrasting procedural challenges under the Hobbs Act with substantive challenges with no time period restriction); *see also NLRB Union v. Fed. Labor Relations Auth.*, 834 F.2d 191, 195 (D.C. Cir. 1987).

For this reason, *Jem Broadcasting Company v. Federal Communications Commission*, 22 F.3d 320 (D.C. Cir. 1994), and *Hardin v. Jackson*, 625 F.3d 739 (D.C. Cir. 2010), are inapposite. (Def. Supp. Mem. at 2-5.) Each involved alleged *procedural* defects to the rules at issue. *See,*

---

[1] In the two rules at issue, FWS has simply dropped the words "continental" and "Hawaii" from its prohibitory language. *See* 80 Fed. Reg. 12703, 12703 (March 10, 2015) (prohibiting "transportation between States, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States"); *see also* 77 Fed. Reg. 3330, 3330 (Jan. 23, 2012) (same). For this, among other reasons, FWS' rules are "contrary to law" and "short of statutory right" within the meaning of 5 U.S.C. § 706(2)(A), (C).

[2] *See Sebelius v. Auburn Regional Medical Center*, 133 S. Ct. 817, 824 (2013) (reiterating the "bright line" rule that "a statutory limitation" is not jurisdictional unless "Congress has 'clearly state[d]' that the rule is jurisdictional.") (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)). 28 U.S.C. § 2401(a) does not say it is jurisdictional.

*e.g.,* 625 F.3d at 741 (plaintiffs allege "EPA violated FIFRA's procedural requirements"); 22 F.3d 324-25 (holding "challenges to the *procedural lineage of agency regulations* … will not be entertained outside the 60-day period provided by statute").  Indeed, in *Jem Broadcasting*, the D.C. Circuit distinguished such procedural challenges from "substantive" challenges that may be brought outside the limitations period. 22 F.3d at 325 (citing *Functional Music, Inc. v. FCC*, 274 F.2d 543, 546 (D.C. Cir. 1958), *cert. denied*, 361 U.S. 813 (1959)); (*see also* Pl. Supp. Br. at 17).

Defendants also offer a 15-year-old Ninth Circuit decision. (Def. Supp. Mem. at 3 (citing *Shiny Rock Mining Corp. v. United States,* 906 F.2d 1362, 1365 (9th Cir. 1990)).)  *Shiny Rock* did not discuss the concept of standing, but rather "notice."[3]  Even then, not one year later, the Ninth Circuit questioned its holding, noting that *Shiny Rock* "may not be in step with that of other circuits."  *Wind River*, 946 F.2d at 717 n.2 (citing *Illinois Cent. Gulf R.R. Co. v. ICC,* 720 F.2d 958, 961 (7th Cir. 1983)).  In *Wind River*, more importantly, the court upheld the D.C. Circuit's rule that a substantive challenge to application of a rule may be brought "later than six years following the decision."  *Id.* at 715.

Secondly, FWS' flawed analysis reads more into the mitten crab regulation than that rule can support.  Under 18 U.S.C. § 42(a)(1), the FWS is authorized to add a species to the list "by regulation."  Thus, the general interstate transportation condition contained in the preamble to the regulatory change adding the mitten crab to the injurious species list, to the extent it is lawful, applies only to all who might then, or someday, want to trade in mitten crabs.  The same is true for subsequent species listings.  (*See* Pl. Supp. Br. at 14-15.)  The actual regulation of general applicability itself, 50 C.F.R. § 16.3, contains no interpretation (a point the government

---

[3] *Id.* at 1364.  *Shiny Rock* is also distinguishable because it too involved a procedural challenge. *See id.* at 1363 (plaintiff  alleged "violations of statutes and regulations in the formulation and publication" of the rule); *see also Wind River Min. Corp. v. United States*, 946 F.2d 710, 717 (9th Cir. 1991) ("*Shiny Rock* dealt with a procedural challenge to the agency's action.").

3

concedes when it points to the mitten crab rule rather than the general regulation as the agency action allegedly starting the limitations clock).[4] (Def. Supp. Mem. at 3.)

FWS' other cases are also of no help. In *Harris v. FAA*, 353 F.3d 1006 (D.C. Cir. 2004), Plaintiffs waited 18 years after agreeing to an employment policy under which they were hired to challenge its terms. *Id.* at 1009. There was simply no bar to their challenging the policy when they were hired. *Alaska v. U.S. Department of Agriculture*, 932 F. Supp. 2d 30 (D.D.C. 2013), *rev'd*, 772 F.3d 899 (D.C. Cir. 2014), and *Norwest Bank v. FDIC*, 312 F.3d 447 (D.C. Cir. 2002), involved challenges to rules adopted more than six years prior to suit. Here, by contrast, Plaintiffs are not seeking to challenge the mitten crab listing. Rather, they have brought a timely substantive challenge to two constrictor snake rules.[5] The mitten crab rule does not apply to Plaintiffs; indisputably, FWS would not charge Plaintiffs with violating the mitten crab rule for taking a snake to a veterinarian in another state.

Finally, while agencies have an interest in repose, such repose can only be attained by promulgating an interpretative rule, which FWS has not done for the relevant question. (Even then, this Court would have jurisdiction to decide this applied, substantive challenge).

## II. EVEN HAD DEFENDANTS INTERPRETED THE LACEY ACT'S SCOPE, SUCH INTERPRETATION IS AFFORDED NO DEFERENCE

Defendants fail to appreciate the fundamental distinction between *United States v. Apel*, 134 S. Ct. 1144 (2014), and *Abramski v. United States*, 134 S. Ct. 2259 (2014), on one hand, and

---

[4] *Amicus* Humane Society of the U.S. ("HSUS") attempts to fill this interpretive gap by claiming that Section 16.3 prohibits "importation or transportation of injurious wildlife," but overlooks the essential point that both this regulation and the Lacey Act use the exact same "between the continental United States" formulation. (HSUS Br. (Dkt. No. 33-1) at 4 (April 6, 2012).) This only begs the question before this Court. (*See* Pl. Supp. Mem. at 14-15.)

[5] "[W]here an agency reiterates a rule or policy in such a way as to render the rule or policy subject to renewed challenge on any substantive grounds, a coordinate challenge that the rule or policy is contrary to law will not be held untimely because of a limited statutory review period." *Pub. Citizen*, 901 F.2d at 152-53.

Justice Scalia's concurrence in *Whitman v. United States*, 135 S. Ct. 352 (2014), on the other. As Plaintiffs explained, *Apel*, *Abramski*, and the case at bar share a common element missing from *Whitman*, *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687 (1995), and *United States v. Kanchanalak*, 192 F.3d 1037 (D.C. Cir. 1999).  (Pl. Supp. Br. at 18-19.)  In *Apel*, *Abramski*, and this case, the court is construing provisions of Title 18, the U.S. Criminal Code, each of which prescribes a specific *actus reus*.  In the Lacey Act, that unlawful act is "shipment between …."  Each such provision is, in the words of both *Apel* and *Abramski*, part of a "criminal statute." *See, e.g.,* 134 S. Ct. at 2274.  This should end the inquiry.

*Sweet Home*, *Whitman*, and *Kanchanalak* differ materially.  Each statute at issue in those cases – the Endangered Species Act ("ESA), 16 U.S.C. §§ 1531-1544; Securities Exchange Act, 15 U.S.C. §§ 78a-78pp; and Federal Election Campaign Act ("FECA"), 52 U.S.C. §§ 30101-30146, respectively – are civil regulatory statutes that include criminal penalties for certain statutory and regulatory violations.  Indeed, Defendants cite to *Sweet Home*'s invocation of 16 U.S.C. § 1540(b)(1), the ESA's "take" provision.  (Def. Supp. Mem. at 14.)  That provision is contained in a civil law, the ESA.  That same civil law provides for civil and criminal remedies. Defendants fail to appreciate (or even note) this distinction.[6]  (*See* Pl. Supp. Br. at 18-20.)

For its part, *Kanchanalak* (and *In re Sealed Case*, 223 F.3d 775, 107 (D.C. Cir. 2000), also cited by FWS, (Def. Supp. Mem. at 15)), construed the FECA, a civil regulatory statute. Notably, Ms. Kanchanalak was not even prosecuted under the FECA provisions authorizing criminal penalties, then 2 U.S.C. § 437g(d)(2).  Rather, she was charged with "causing a false statement to be made" under 18 U.S.C. §§ 2(b) and 1001.  192 F.3d at 1038.  Nowhere does the D.C. Circuit – and nowhere do Defendants – argue that a court must defer to either the Federal

---

[6] Moreover, neither HSUS nor Center for Invasive Species Prevention, *et al*. (collectively "CISP"), (CISP Br. (Dkt. No. 47) (April 23, 2015), address the issue of construction of a criminal statute nor even use the word "criminal" at all.

5

Election Commission's or the Department of Justice's interpretation of these two "criminal statutes."

Nor do Defendants identify a tenable distinction between the case at bar and *Abramski* and *Apel* when they claim that neither of the cases "mention *Chevron*[7] and do[] not address the circumstances presented here – whether an agency with delegated authority to promulgate regulations to implement a criminal statute is entitled to deference in interpreting that statute." (Def. Supp. Mem. at 17.) This claim is simply not accurate.

*Abramski* did, in fact, involve an agency with delegated authority to promulgate regulations. The case centered on federal gun laws contained in Title 18 establishing a system of in-person identification and background checks. 1347 S. Ct. at 2263-64. The Gun Control Act of 1968, 18 U.S.C. § 921 *et seq.*, required gun dealers to maintain records "for such period, and in such form, as the Attorney General may by regulations prescribe." *Id.* § 923(g)(1)(A). The False Claims Act violation of which Mr. Abramski was convicted rested on a false statement contained in the form the Attorney General issued. 134 S. Ct. at 1174 (citing 27 C.F.R. § 478.124(b)). Thus, under Defendants' theory, the Supreme Court should have deferred to the position of the agency in question (ATF). But the Court instead found the agency's position "not relevant at all." 134 S. Ct. at 2274.

*Apel* also involved an agency with delegated authority to implement regulations, found at 32 C.F.R. § 809a, to support its administration of the criminal trespass statute, 18 U.S.C. § 1382. *See* 134 S. Ct. at 1147. The Court cited regulations implementing the Department of the Air Force's "Installation Entry Policy," which provide commanders with authority to grant or deny

---

[7] The absence of a *Chevron* discussion in *Apel* and *Abramski* is not notable; the Court categorically stated "the Government's reading of a criminal statute is [not] entitled to any deference." 134 S. Ct. at 1151 (concurring opinion of J. Scalia) (citing *Crandon v. United States*, 494 U.S. 152, 177 (1990)). No clearer indication that *Chevron* does not apply is possible.

6

access to their installations and to exclude or remove persons whose presence is unauthorized. *Id.* at 1147 (citing 32 C.F.R. § 809a.2(b)); *see also id.* at 1148-49, 1151 (citing various subsections of 32 C.F.R. § 809a). *Apel* neither deferred to the agency's interpretation, nor identified the distinction FWS advances here. *Id.* at 1151.

Thus, Defendants have identified no tenable way to distinguish *Apel* and *Abramski*. In fact, they have done just the opposite: the Criminal Code provisions at issue in *Apel* and *Abramski* provided for a far greater scope of regulatory discretion than 18 U.S.C. § 42(a), which allows FWS merely to declare species as injurious via regulation. Finally, and perhaps most fundamentally, the Supreme Court rendered the decisions in *Apel* and *Abramski*. Those cases' unvarnished pronouncements that a court should not defer to an agency's interpretation of a "criminal statute" post-date all authority Defendants cite purportedly to the contrary.

### III. THE LACEY ACT'S SUBSEQUENT LEGISLATIVE HISTORY EVINCES NO CONGRESSIONAL INTENT TO ADOPT THE FWS' INTERPRETATION

Plaintiffs have shown Defendants' interpretation of the Lacey Act's geographic scope is at odds with the its direct legislative history and even the agency's intent when drafting the language. In response, Defendants and *amici* point to legislative history for very narrow Lacey Act amendments (only adding the names of new species to the statute) and unenacted legislation. (*See, e.g.,* Def. Supp. Mem. at Part II.A; HSUS Br. at 4; CISP Br. at 6.) In its recent submission, FWS doubled down on this strategy, drawing the Court's attention to even more remote legislation and congressional documents.

As previously noted, Congress' additions of the zebra mussel and bighead carp to the injurious species list were non-controversial and limited in effect, similar to past requests FWS made to adjust the scope of wildlife addressed by the law. (Pl. Supp. Br. at 6-9; *see also* Dkt. No. 31-1 at 00010 (Interior Dept. letter explaining purpose of FWS' recommended amendments

7

to authorize the Secretary to list additional classes of animals, including reptiles, as injurious).) These changes were made to address specific exigencies, and, in so addressing them, Congress was not required to consider the entire statutory scheme.[8] For example, with the zebra mussel and bighead carp amendments, Congress passed, with the absolute minimum of formality, the narrow listings. Congress could consider those changes without having to pay attention to the whole statutory scheme, which it was not being asked to rewrite, to re-enact, or even to consider.

By contrast, in 1960, it is completely implausible that Congress had chosen the wording "between the continental United States" and other listed jurisdictions, as a backhanded way of saying "interstate commerce."[9] (Pl. Supp. Br. at at 12-13.) Congress employed unambiguous wording that mirrored similar use in other statutes. (*Id*. at 5-6.) The legislative history also makes it patent that FWS' proffered language was meant to address a specific problem with the mongoose, then established in Hawaii, Puerto Rico, and the Virgin Islands. (*Id*. at 4.) Additionally, the Congress of 1960 was highly sensitive to issues of federalism and, as with civil rights and organized crime, it acted with unmistakable intent when it meant to invoke the interstate commerce power to preempt state power. (*Id.* at 12-13.) It would express a lack of fidelity to the enacted law, to retroactively import into the 1960 Act a powerful coverage of interstate commerce which the Congress of that time manifestly did not enact.

By the 1980s, however, FWS seems to have recognized the law's jurisdictional limits. The Lacey Act prohibited importation and "shipment between" various locations, but not

---

[8] Of course, in 1960, Congress did provide detailed attention to the jurisdictional scope of the law, though not because it was adding fish, amphibia, and reptiles, but in response to FWS' specific request that it do so.

[9] *Amicus* Humane Society of the U.S. ("HSUS") likens the inquiry into past legislative history – including that of the Congress that wrote the language at issue – to a trip "down a rabbit hole." (HSUS Br. at 7.) Clearly, the enacting Congress' view is relevant, while the post-1960 snippets FWS and *amici* favor appear more like an Easter egg hunt (to extend the "bunny" analogy).

"interstate commerce" as a general matter. FWS did not go to Congress to resolve its problem. Rather, FWS decided to re-write the law *sub silento*. Thus, in a series of species listings, Defendants quietly began to add interstate transportation bans and, eventually, to treat the statute as though Congress had inserted the powerful words "interstate commerce." For many years, it was as if a tree fell in the forest; FWS never used the Lacey Act to regulate anything in active interstate commerce.

Now, FWS asks this Court to sanction two remarkable propositions: first, to approve its backhanded re-writing of the law; and, second, to find that Congress re-enacted the Lacey Act in its entirety simply by adding names to a list and considering tangential legislation. Even ignoring the lack of re-enactment, moreover, Defendants contend Congress met the very high standard of legislative knowledge for ratification. These claims are not tenable.

    **A.**    **Congress Has Not Ratified FWS' View nor Re-Enacted the Lacey Act**

In many respects, FWS stakes its case on the re-enactment doctrine. Highly prominent in this Court's questions were the significance of the congressional listings of the zebra mussel and the bighead carp. This makes sense: the relevant doctrines turn, not on what the agency does on its own, but on what Congress does – what the legislature knows, discusses, and above all enacts – with respect to the specific interpretation. (*See* Pl. Supp. Br at 10-13.) Congress did not delegate the interstate commerce power in 1960; did it later?

FWS claims the answer to be "yes," via the re-enactment doctrine. FWS first sets forth the terms of the doctrine, relying on two D.C. Circuit cases from the 1980s and 1990s. (*See* Def. Supp. Br. at 7 (quoting *Public Citizen v. FAA*, 988 F.2d 186, 194 (D.C. Cir. 1993) (citing *Barnett v. Weinberger*, 818 F.2d 953, 963 n.89 (D.C. Cir. 1987)).) "[W]here Congress has *re-enacted* the statute without pertinent change[,] congressional failure to revise or repeal the agency's

interpretation is persuasive evidence that the interpretation is the one intended by Congress." (*Id.* at 12 (quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274-75 (1974)) (emphasis added).) FWS also contends the materials on which it relies are not mere post-enactment legislative history. (*See id.* at 13 ("[C]omments made during consideration of a measure that amended and *reenacted* a statute [are not] mere postenactment history.") (quoting *State of Ohio v. Dep't of Interior*, 880 F.2d 432, 453 n.30 (D.C. Cir. 1989) (emphasis added).

Such heavy reliance on the re-enactment doctrine is unavailing. There simply was no re-enactment. No subsequent legislation ever revisited the operative phrase "between continental United States" and other locations. Those decisive words were adopted in 1960. Then, and only then, did the House and the Senate pass these words and the President sign them into law. Congress never had hearings on re-enacting them, and never held debate on the floor on re-enacting them. In all the FWS' testimonial statements and other sources cited in Defendants' briefs, none say these provisions were re-enacted.

The judicial opinions Defendants cite do not place emphasis, just by happenstance, on the word "re-enactment" Defendants recite five times. There is no greater distinction in the judicial analysis of the issue here – the effect of subsequently adopted legislation – than the distinction whether the later law merely changed some non-operative words, as here, or rather re-enacted those operative words.

The distinction between congressional re-enactment – and non-re-enactment – is underscored by authority in this Circuit. In *Public Citizen, Inc. v. U.S. Dept. of Health and Human Services*, 332 F.3d 654 (D.C. Cir. 2003), plaintiffs challenged agency regulations, and the agency relied on the ratification doctrine. *Id.* at 668. The court, noting how ratification law had developed, focused on re-enactment doctrine and held it did not apply because "this is not a

case in which 'Congress re-enact[ed] a statute without change.'" *Id.* (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 382 n.66 (1982)) (alteration in original).

Rather, as here, Congress had "simply enacted a series of isolated amendments to other provisions." *Id.* The court compared the holding in *Alexander v. Sandoval*, 532 U.S. 275, 292 (2001) ("[W]hen Congress has not comprehensively revised a statutory scheme but has made only isolated amendments, ... [i]t is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of the Court's statutory interpretation"), with that in *Barnhart v. Walton,* 535 U.S. 212, 220 (2002) (according weight where "Congress has frequently amended or reenacted *the relevant provisions* without change" (emphasis added)). *Id.* (alterations in original); *see also Cape Cod Hospital v. Sebelius*, 630 F.3d 203, 214 (D.C. Cir. 2011) ("'Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change,' … this canon of statutory interpretation has little relevance here given that Congress has never reenacted section 4410.") (quoting *Merrill Lynch*, 456 U.S. at 382 n.66).

### B. Legislative Materials Prove that Congress Did Not Demonstrate Enough Requisite Knowledge of the Interpretation to Achieve Ratification

FWS also argues that Congress had achieved a sufficiently high level of knowledge to have ratified the agency's interpretation. (Def. Supp. Br. at Part II.A.) Again, ratification centers on what Congress knows, considers, debates, and does – not how the agency feels about its own interpretation. Moreover, the courts approach, with the greatest of caution, the attribution of legally decisive significance to fragments of legislative history. *Supra.* Indeed, the exhibits to FWS' Supplemental Brief are a collection of quasi-legislative materials, which, by their nature, seem more to refute than to support the agency's position.

11

1.  **The Zebra Mussel and Bighead Carp History Does Not Support Ratification**

The zebra mussel and the bighead carp measures – hastily passed with cursory procedures that did not include votes or meaningful debate (Pl. Supp. Br. at 8-9) – cannot serve as a basis for finding a delegation of the interstate commerce power. For instance, FWS provides a Judiciary Committee report from 2008 – the Congress *before* the one that enacted the bighead carp bill. Such a report cannot demonstrate the requisite level of knowledge by members who *enacted* the relevant 2010 carp listing. FWS also offers delegation letters signed by a dozen or so members (the second being little more than a "cut and paste" of the first) as "legislative history." These letters are not published in a hearing record, committee report, or the *Congressional Record*. Relevance of these materials to the crucial issue is less than minimal.

The House floor discussion of the carp listing in 2010 is one of, if not the only, times in Congress' consideration of either of these statutes where several members actually said anything whatsoever pertinent. The *Congressional Record* does not afford the clarity which the Defendants ascribe. Representative Biggert of Illinois, for instance, gave a speech in which she referred to a ban on importation, but not on interstate commerce:

> One of the things that is now taking place is certainly the fishing for these fish further down the river, and they are now sending the fish to China where they are turning them into food over there.
>
> But the bill that we are considering today will add the big head species of the Asian carp to the list of injurious species under the Lacey Act and prevent their sale or importation into the United States. This ban would not apply to the dead fish that I was just talking about-they are caught and sent to China as dead fish-and includes only the species of the invasive carp that the Federal wildlife managers found last June in Lake Calumet in Illinois.

(Dkt. No. 44-5 at 3 (156 Cong. Rec. H7821).) Rep. Biggert never mentions interstate commerce.

Representative Petri also addressed importation: "Madam Speaker, as a representative from the Great Lakes region and a cosponsor of the House version of this bill, I support passage

of S. 1421, the Asian Carp Prevention and Control Act. S. 1421 will explicitly ban Asian carp from being imported or shipped to the U.S." *Id.* Like Rep. Biggert, he discusses carp being "imported or shipped into the United States." It is impossible to tell whether either Member had any idea FWS had unilaterally extended the Lacey Act to reach interstate commerce. A determination of re-enactment cannot be an exercise in judicial clairvoyance. Whatever Reps. Biggert's and Petri's words mean, they cannot reasonably be understood to address FWS' implicit (at best) "interpretation" with the high level of knowledgeable discussion, expert attention, and sophisticated understanding required for ratification, not to mention ratification.

### 2. Unrelated Bills Cannot Illustrate Knowledge of the Agency's Interpretation

Two of the bills upon which FWS relies for its ratification via re-enactment argument do not even amend the Lacey Act at all, and one, H.R. 2158, which was to deal with export of constricting snakes, was not even adopted. (The other statute is the North Texas Zebra Mussel Barrier Act of 2012, which was adopted as part of a Clean Water Act amendment.) (*See* Def. Supp. Mem. at 10.) In each instance, Congress (or one house, at least) was dealing with problems created by FWS' enforcement of the Lacey Act, but neither purported to re-interpret that law. Notably, no case law supports the proposition that passage of *other* laws can effect ratification of an agency interpretation through re-enactment.

In the case of the North Texas bill, the House Report (H.R. Rep. No. 112-657, 112th Cong., 2d Sess. (2012)), appended as Exhibit 6 to Defendants' Supplemental Memorandum (Dkt. No. 44-6)), notes that Congress was merely addressing a $100 million-plus problem created by FWS. According to the Report, "the Service advised the [North Texas Municipal Water District] that because of the revised boundary delineation, the use of the pump station would constitute an interstate transfer of water and a violation of the Lacey Act because invasive zebra mussels

13

would be transported across state lines." (*Id.* at 2.) The only language remotely helpful to Defendants' cause in the Report is a misquote of the statute's language,[10] which evidences confusion, not a knowing intent to amend the Lacey Act.

Defendants are simply wrong to claim that "[t]his law would not have been necessary but for Congress' agreement that the Lacey Act prohibits transportation of injurious species between states within the continental United States." (Def. Supp. Mem. at 11; *id.* at 10 (same with respect to snake bill).) Congress is not a court of law with power to opine definitively as to a law's meaning; rather, it must its primary tool–legislation–to address realities created by administrative agencies. In both the snake air transport and the North Texas water bills, Congress was trying to deal with FWS-created problems that were adversely affecting constituents.

### 3. Past Agency Testimony Does Not Illustrate Congressional Knowledge of the Agency's Interpretation

Defendants also cite to FWS' own past testimony to demonstrate Congress has long been aware of the agency's interpretation of the statute. (Def. Supp. Mem. at 11-12 & n.4.) On the contrary, an examination of the FWS testimony provided raises serious doubts that the average member of Congress had ever specifically considered Section 42(a)'s geographic scope.

The testimony of Steve Williams, FWS Director, Nov. 14, 2002 (*see* Def. Supp. Mem. at 11 n.4), is four single-spaced pages devoted to a bill to amend the 1990 zebra mussel bill. It has no separate section on interstate authority. Rather, there is a section entitled "Screening of Planned Importations." The focus is, of course, on importations. At the tail end of the second paragraph under this heading is buried the phrase quoted by the government, that the 2002 rule barred "import into the United States or transport across State lines" of the snakehead fish.

---

[10] Specifically: "Once listed as injurious, species may not be imported into the United States or *transported* between *the states*, the District of Columbia, Hawaii, or any territory or possession of the United States by any means without a special permit issued by the Service." (*Id.* at 2 (emphasis added).)

14

FWS omits the name of the hearing for the Testimony of Marshall Jones, FWS Deputy Director, July 17 2003, (*see id.*); to wit, the "Impact of *Imported* Exotic Species on Public Health." (emphasis added). Mr. Jones spends nearly all of his six pages focusing on "laws and regulations that now govern the importation of exotic wildlife." Buried on page three is the quote Defendants rely upon in their brief relating to "interstate transportation of wildlife." (*Id.*) In a similar vein, the testimony of Dr. Mamie Parker, FWS Assistant Director for Fisheries and Habitat Conservation, also cited by Defendants, contains eight pages of single-spaced testimony, only three of which deal with "Injurious Wildlife Evaluations Under the Lacey Act." There, she explains the nuances of evaluating a species for listing as injurious, with only one off-hand statement referring to Secretary's authority to "prohibit the importation and interstate transportation of species designated as injurious." (*Id.*)

The issue is not whether FWS has shown a trail of legislative bread crumbs that would lead a knowledgeable and motivated person to discover the agency's position. Considering the testimony in ratification terms, Defendant's proffered history is a classic example of when ratification has *not* occurred. Bits and pieces of an agency position scattered through its enormous body of presentations to the Congress – often mentioned during hearings on entirely different subjects in which even the other witnesses were not paying any attention to this point or were going in the opposite direction from FWS – do not meet the high bar for ratification.

IV.  **PLAINTIFFS HAVE SHOWN PREJUDICE SUFFICIENT TO DEMONSTRATE LIKELIHOOD OF SUCCESS ON THEIR RFA CLAIM**

Plaintiffs have detailed the injury stemming from Defendants' failure to meet the RFA's requirements. (Pl. Supp. Br. at 22-24.) To be sure, a plaintiff "must indicate with reasonable specificity what portions of the documents it objects to and how it might have responded if given the opportunity." (Def. Supp. Mem. at 20 (quoting *Gerber v. Norton*, 294 F.3d 173, 182 (D.C.

15

Cir. 2002)).) Plaintiffs did just that in their last submission and, in detail, in their declarations. While the RFA is a "procedural" statute, it has a specific remedial purpose. Indeed, the D.C. Circuit has recognized that even where failure to meet the APA's procedural steps can be considered "harmless," an RFA violation may not be. *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 42-43 (D.C. Cir. 2005). While the RFA incorporates APA standards, *see* 5 U.S.C. § 611, it has its own injunctive relief remedy. *Id.* § (a)(4)(B). It is a law Congress wants to see enforced.

Further, Defendants' contention that "Plaintiffs have not identified any studies or data that the FWS overlooked or failed to take into account," (Def. Supp. Br. at 21), does not address the harm Plaintiffs have identified. As noted, nothing in the 2010 Initial Regulatory Flexibility Analysis ("IRFA") alerted reticulated python and green anaconda breeders that FWS had determined that there would be "essentially no material economic impact" from these two species' listing in 2015, nor that it was considering state regulation as an alternative. (Pl. Supp. Br. at 24.) In other words, the affected small business community had no way to know what relevant information FWS would ultimately "overlook[] or fail[] to take into account." The point of the RFA is for an agency to furnish proposed alternatives and its assessment of their economic impacts so that small businesses have the chance to evaluate that information and respond.

Nor were Plaintiffs aware that Defendants failed to appreciate the high-value, specialty market that had developed since the 2012 rule. Breeders and pet owners alike had adapted since the 2011 IRFA and the 2012 listing. In *Southern Offshore Fishing Association* ("*SOFA*"),[11] the court summarized a prior holding in the following terms:

> I held that NMFS' conclusion that the drastic quota reduction would have no meaningful economic effect on commercial shark fishermen was arbitrary and capricious. I noted that the agency's inexplicable failure to recognize the existence of the "directed shark fishery"–a small but well-defined group of

---

[11] *SOFA v. Daley*, 55 F. Supp. 2d 1336 (M.D. Fla. 1999), *vacated on settlement*, 2000 WL 33171005 (M.D. Fla., Dec. 7, 2000).

16

> fishers who concentrate their commercial efforts on harvesting shark stocks–
> undoubtedly tainted the agency's statutorily required consideration of less
> restrictive alternatives in formulating the quotas.

*Id.* at 1337 (citing *SOFA v. Daley*, 995 F. Supp. 1411 (M.D. Fla. 1998)). In this case, one could substitute "specialty reticulated python and green anaconda breeders" for "directed shark fishers." The court then discussed extensively the prejudice that comes from an agency's preparing a FRFA without the benefit of the back-and-forth dialogue that follows reasonable adherence to the RFA process. *Id.* at 1337-38 (quoting 995 F. Supp. at 1436-37).

For its part, FWS' 2010 constrictor snake IFRA analyzed *no* "significant" alternatives, and referenced only "three alternatives to the proposed rule: (1) no action, (2) the listing of seven species as injurious wildlife, and (3) the listing of five species as injurious wildlife," each of which were set forth in the draft EA. (Dkt. No. 31-2 at 5.) The 2015 FRFA only discussed these alternatives, as modified (but never set forth in an IRFA) in light of the 2012 partial listing, and utterly fails to explain how any of those might minimize adverse impacts on small entities. (Dkt. No. 45-1 at 16-18.) The court in *Southern Offshore* recognized the prejudice from an agency end-running the RFA – even to the point of convening special master proceedings to assess the agency's good faith. This Court should likewise recognize the prejudice from an agency's use of the 2015 FRFA not as the capstone of an informed process focused on small businesses in the constrictor snake trade, but as a means of "agreeably decorat[ing]" a predetermined conclusion. 995 F. Supp. at 1436.

V.     **AMICI PRESENT NO LEGAL BASIS FOR THIS COURT TO DENY RELIEF**

HSUS's and CISP's briefs are long on policy arguments, but almost entirely irrelevant to the case at this particular stage of litigation. In particular, CISP opines that "[a] ruling here declaring [FWS' claimed] authority to be *ultra vires* would be devastating to implementation of

17

27 current regulatory listings amounting to at least 243 injurious species, and also devastating to several pending Petitions and proposals for new listings." (CISP Br. at 3.) While a merits decision that the Lacey Act, properly construed, does not grant Defendants authority to impose an interstate transportation ban among the continental states would affect prior listings, here at the preliminary injunction stage, only the March 2015 rule is at issue. And there is no national threat from the reticulated python and green anaconda, as FWS' own analysis shows. (*See* Pl. TRO Mem. (Dkt. No. 28-1) at 34 (April 1, 2015) (showing only a small of Texas and some of Florida even potentially vulnerable).) Furthermore, *amici* give no recognition to state's ability to regulate the snakes at issue – as Texas, Florida, Hawaii, and Puerto Rico have already done.

Clearly, *amici* HSUS's and CISP believe that the harms they allege should suffice to uphold FWS' prevailing view of its Lacey Act authority. While the parade of horribles presented in each brief are certainly alarming, but an application for a preliminary injunction does not present an opportunity for assessing their truthfulness or relevance.[12] Even if these overblown claims of harm are correct, however, they will result only because of the limits of the law itself, something only Congress can rectify. *See Halbig v. Burwell*, 758 F.3d 390, 402 (D.C. Cir. 2014) ("The Constitution assigns the legislative power to Congress, and Congress alone, see U.S. Const. art I, Section 1, and legislating often entails compromises that courts must respect."), *reh'g en banc granted, judgment vacated on other grounds*, 2014 WL 4627181 (D.C. Cir. Sept. 4, 2014)); *Andrade v. Crawford & Co.*, 786 F. Supp. 1302, 1305-06 (N.D. Ohio 1992) (courts have "an obligation to follow the law, as established by Congress"; only Congress can "affirmatively change[ ] the meaning of the law").

---

[12] For instance, Plaintiffs are constrained to agree with HSUS that "rare color morphs … would likely fail to persist in the wild," (HSUS Br. at 15), though that position does not comport with FWS' view on captive-bred snakes. This issue likely will be pursued further on a full record.

Notwithstanding *amici*'s contrary opinions, Plaintiffs have shown that that they meet the standards for preliminary relief.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Application for a Preliminary Injunction and Relief Pending Review.

Dated: April 27, 2015                                   Respectfully submitted,

*/s/ Shaun M. Gehan*
Shaun M. Gehan
D.C. Bar No. 483720
The Law Office of Shaun M. Gehan, PLLC
3050 K Street, N.W. – Suite 400
Washington, D.C. 20007
Telephone: (202) 342-8469
Facsimile: (202) 342-8451

David E. Frulla
D.C Bar No. 414170
Paul C. Rosenthal
D.C. Bar No. 235242
Kelley Drye & Warren LLP
3050 K Street, N.W. – Suite 400
Washington, D.C. 20007
Telephone: (202) 342-8400
Facsimile: (202) 342-8451

*Attorneys for Plaintiffs*