**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| **UNITED STATES ASSOCIATION OF** ) | |
| **REPTILE KEEPERS, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 13-2007 (RDM)** |
| ) | |
| **THE HONORABLE SALLY JEWELL,** ) | |
| **et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

<u>**MEMORANDUM OPINION**</u>

The Department of the Interior undeniably has the authority to prohibit the importation of species of wild animals deemed by the Congress or the Department to be injurious to human beings, agriculture, horticulture, forestry or other wildlife.  This case presents the question whether Congress has also authorized the Interior Department to ban the interstate transportation of these "injurious species."  The case addresses, in particular, whether the Department acted within its authority when it issued regulations purporting to prohibit the interstate transportation of certain species of large constricting snakes, including the reticulated python, which can grow to over 20 feet in length, and the green anaconda, which is almost certainly the heaviest snake in the world.  Ultimately, however, the scope of the Interior Department's authority to regulate the interstate transportation of "injurious species" depends on the history of the zebra mussel, which is a mollusk about the size of a quarter, and the bighead carp, which is a freshwater fish with a voracious appetite.  For the reasons explained below, Defendants have failed to establish at this point in the litigation that this history is sufficient to confer an authority on the Department that

Congress did not confer when it enacted the controlling statutory text.

Before the Court is Plaintiffs' motion for a preliminary injunction (Dkt. 28). Plaintiffs seek an order enjoining the Secretary of the Interior, Sally Jewell, and the U.S. Fish and Wildlife Service (collectively, "Defendants") from implementing the final rule promulgated on March 10, 2015, which adds four species of constricting snakes to the list of injurious species under the Lacey Act, 18 U.S.C. § 42. A hearing on the motion was held on April 7, 2015, and, upon consideration of the parties' arguments and submissions, and for the reasons explained below, the motion is **GRANTED** in part and a preliminary injunction will issue. In light of the requirement that injunctive relief be "narrowly tailored to remedy the specific harm shown," *Neb. Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006), the parties are **ORDERED** to submit supplemental briefs on the proper scope of the injunction and whether a brief stay is appropriate. The parties are further **ORDERED** to appear for a status conference on May 18, 2015 at 10:00 AM to address the scope of the injunction. The Court will issue a preliminary injunction after hearing from the parties regarding its proper scope.

## BACKGROUND

This action challenges rules promulgated by the Department of the Interior ("Department") that prohibit the importation and interstate transportation of certain species of constricting snakes. In 2010, the Department proposed a rule listing nine constricting snake species as "injurious" under the Lacey Act, 18 U.S.C. § 42. *See* 75 Fed. Reg. 11808 (March 12, 2010). When the Secretary of the Interior designates a species as "injurious to human beings, . . . agriculture, horticulture, forestry, or . . . wildlife or the wildlife resources of the United States," the Lacey Act prohibits "importation" of that species "into the United States, any territory of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any possession of

the United States."  18 U.S.C. § 42(a)(1).  It also prohibits "any shipment" of the species

"between the continental United States, the District of Columbia, Hawaii, the Commonwealth of

Puerto Rico, or any possession of the United States."  *Id.*

On January 23, 2012, after a notice and comment period, the Department issued a final

rule listing four of the nine species as "injurious."  77 Fed. Reg. 3330 (Jan. 23, 2012) (the "2012

Rule").  The rule prohibited "the importation into the United States and interstate transportation

between States, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or

possession of the United States of any live animal, gamete, viable egg, or hybrid" of those four

snakes.  *Id.*

The United States Association of Reptile Keepers ("USARK") filed this lawsuit on

December 18, 2013.  On May 9, 2014, with leave of the Court, USARK filed an amended

complaint alleging (1) that the ban on interstate transportation of listed species in the 2012 Rule

exceeded the Interior Department's powers under the Lacey Act (Dkt. 21 ¶¶ 78-84); (2) that the

2012 Rule failed to comply with the requirements of the National Environmental Policy Act

("NEPA") (Dkt. 21 ¶¶ 85-94); and (3) that in promulgating the 2012 Rule the Department of the

Interior abused its discretion and acted arbitrarily and capriciously (Dkt. 21 ¶¶ 95-97).

Defendants moved to dismiss the amended complaint (Dkt. 22).

On March 10, 2015, the Interior Department promulgated another final rule listing four

additional constricting snake species—the reticulated python, DeSchauensee's anaconda, green

anaconda, and Beni anaconda—as "injurious."  80 Fed. Reg. 12702 (Mar. 10, 2015) (the "2015

Rule").  Like the 2012 Rule, the 2015 Rule prohibited both "importation" and "interstate

transportation between States" of the newly listed species.[1]  *Id.*  It explained that two of the listed

---

[1]  The language prohibiting interstate transportation of the listed species appears in the preamble
to the 2015 Rule.  As Defendants acknowledge, "[a]n agency's interpretation of a statute in the

species—the reticulated python and the green anaconda—were among the "largest snakes in the world"; that both were already "present in U.S. trade"; and that examples of both "ha[d] been found in the wild in south Florida." *Id.* at 12704.  The Department was chastened by its experience with the Burmese python, which it cited as an "example of a species that may not have become so invasive in Florida if it had been listed before it had become established." *Id.*  And it noted that the listed snakes were "highly likely to prey on U.S. native species" and, if introduced into the wild, would rank among the most powerful predators in North America. *Id.* at 12713 (reticulated python); *see id.* at 12716-17 (green anaconda).  The 2015 Rule took effect on April 9, 2015—30 days after the final rule was published.

USARK moved for leave to file a Second Amended Complaint on March 23, 2015.  Dkt. 27.  The Second Amended Complaint challenges both the 2012 and 2015 Rules.  In addition to the arguments raised in the First Amended Complaint, it alleges that the Rules' prohibition on interstate transportation of listed snakes impermissibly burdens snake owners' constitutional right to travel (Dkt. 38 ¶¶ 109-117) and that the Interior Department failed to satisfy the requirements of the Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.* (Dkt. 27-1 ¶¶ 131-135).  The Second Amended Complaint also adds four individual plaintiffs, all of whom allege that they will be harmed by one or both of the challenged Rules.  Dkt. 38 ¶¶ 13-16.  The Court granted the motion for leave to amend on April 8, 2015.  Dkt. 37.

On April 1, 2015, Plaintiffs filed an Application for Temporary Restraining Order.  Dkt. 28 ("TRO Application").  The TRO Application sought to enjoin implementation of the 2015 Rule.  Plaintiffs argued that they are likely to prevail on the merits based on their statutory

---

preamble to a rule may be subject to challenge."  Dkt. 44 at 4 (citing *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1308-09 (D.C. Cir. 1991) (invalidating statutory interpretation that was set out in preamble to promulgated rule)).

construction and Regulatory Flexibility Act arguments.[2]  They further argued that the individual

plaintiffs and members of USARK will suffer irreparable harm if the 2015 Rule takes effect.

The TRO Application addressed only the reticulated python and green anaconda; Plaintiffs

acknowledge that "[t]he other two species" listed in the 2015 Rule, "the Beni and

DeSchauensee's anaconda, are not even found in the United States, in trade or otherwise."  *Id.* at

4.  Thus, Plaintiffs have not requested that the Court enjoin application of the 2015 Rule as to

those snakes (and it is unlikely Plaintiffs would have standing to do so).  After briefing on the

TRO Application, the Court held a hearing on the application.  At the hearing, the parties agreed

the TRO Application could be treated as a motion for a preliminary injunction; accordingly, the

Court denied the request for immediate relief and ordered the parties to submit supplemental

briefing on a number of issues.  *See* Dkt. 37; Dkts. 44, 45, 48, 49.[3]  The motion for a preliminary

injunction is now before the Court.

## LEGAL STANDARD

To prevail on a motion for a preliminary injunction, the party seeking relief must show

"(1) a substantial likelihood of success on the merits; (2) that the moving party would suffer

irreparable injury if the relief were not granted; (3) that the balance of equities tips in the

movant's favor; and (4) that an injunction is in the public interest."  *EDF Res. Capital, Inc. v.*

*U.S. Small Bus. Admin.*, 910 F. Supp. 2d 280, 283 (citing *Chaplaincy of Full Gospel Churches v.*

*England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).  The Court of Appeals for this Circuit long

evaluated these factors on a "sliding scale."  *E.g.*, *Davenport v. Int'l Bhd. of Teamsters, AFL-*

---

[2]  Because those claims will require review of the yet-unfiled administrative record, Plaintiffs
assert that they do not rely on their NEPA and arbitrary-and-capricious claims for purposes of
the TRO Application.  Dkt. 28-1 at 14.

[3]  The Court also received amicus briefs from the Humane Society of the United States (*see* Dkt.
39) and the Center for Invasive Species Prevention, the Natural Areas Association, and the
Wildlife Society (*see* Dkt. 47).  The Court thanks amici for their assistance in this matter.

*CIO*, 166 F.3d 356, 360-61 (D.C. Cir. 1999).  It has recently read the Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), however, "at least to suggest if not to hold" that plaintiffs face "a more demanding burden" under which "a likelihood of success is an independent, freestanding requirement for a preliminary injunction," *Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011) (quotation marks omitted).  This issue remains the subject of some uncertainty in this Circuit.  *See Am. Meat Inst. v. U.S. Dep't of Agric.*, 746 F.3d 1065, 1074 (D.C. Cir. 2014), *reinstated in relevant part by* 760 F.3d 18 (D.C. Cir. 2014) (en banc) ("[t]his circuit has repeatedly declined to take sides . . . on the question of whether likelihood of success on the merits is a freestanding threshold requirement to issuance of a preliminary injunction").   Nonetheless, it is clear that the plaintiff's likelihood of success on the merits is a "key issue [and] often the dispositive one" at the preliminary injunction stage. *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1083 (D.C. Cir. 2011).  At a minimum, where movants make "a weak showing on the first factor," they need "to show that all three of the other factors so much favor the [movants] that they need only have raised a serious legal question on the merits." *Am. Meat Inst.*, 746 F.3d at 1074 (quotation marks omitted).

## DISCUSSION

### I.    Likelihood of Success on the Merits

Plaintiffs rely on their statutory construction and Regulatory Flexibility Act claims in their attempt to show that they are likely to succeed on the merits.  Because the Court concludes that there is a substantial likelihood that Plaintiffs will prevail on their statutory construction claim, Plaintiffs have satisfied this prong of the preliminary injunction test.

### A.    *Plaintiffs' Statutory Construction Claim*

The crux of Plaintiffs' statutory construction claim is their contention that, with the exception of Hawaii, the Lacey Act does not prohibit interstate shipment of species listed as "injurious" by the Department of the Interior.  Defendants dispute this contention, and further argue that Plaintiffs' claim is barred by the applicable statute of limitations.

1.    *The Statute of Limitations*

Defendants argue, as a threshold matter, that the Court lacks jurisdiction to review Plaintiffs' statutory construction claim because that claim is time-barred under the six-year statute of limitations in 28 U.S.C. § 2401(a).[4]  They claim that, although the preamble to the 2015 Rule states that the Rule's effect is to prohibit interstate transport of the four listed species, the prohibition actually stems from the Interior Department's 1965 Lacey Act regulations (50 C.F.R. § 16.3; the "1965 Regulations").  They reason that because the 1965 Regulations prohibited interstate transportation of listed species, and the 2015 Rule simply listed the four species at issue here, any claim challenging the prohibition on interstate transportation of listed species accrued in 1965 and must have been brought before 1971.

This argument has a serious flaw.  The 1965 Regulations do not "interpret" the Lacey Act's language governing transportation of listed species within the territory of the United States; they simply copy the relevant language.  *Compare* 50 C.F.R. § 16.3 ("the transportation of live wildlife or eggs thereof between the continental United States, the District of Columbia,

---

[4] As Defendants note, the Court of Appeals for this Circuit has held that the limitation period prescribed in § 2401 is jurisdictional.  *See Spannaus v. U.S. Dept. of Justice*, 824 F.2d 52, 55 (D.C. Cir. 1987) (section 2401 creates a "jurisdictional condition attached to the government's waiver of sovereign immunity").  This proposition has been called into question by some courts in light of recent Supreme Court decisions criticizing overuse of the "jurisdictional" label.  *See Appalachian Voices v. McCarthy*, 989 F. Supp. 2d 30, 44 n.5 (D.D.C. 2013) (citing *Harris v. FAA*, 353 F.3d 1006, 1013 n.7 (D.C. Cir. 2004) *and P & V Enters. v. U.S. Army Corps of Eng'rs*, 516 F.3d 1021, 1026 (D.C. Cir. 2008)).  The parties have not addressed whether characterization of the limitation period in § 2401 as jurisdictional affects Plaintiff's likelihood of success on the merits, and the Court need not decide the question.

Hawaii, the Commonwealth of Puerto Rico, or any territory or possession of the United States by any means whatsoever, is prohibited . . .") *with* 18 U.S.C. § 42(a)(1) ("any shipment between the continental United States, the District of Columbia, Hawaii, the Commonwealth of Puerto Rico, or any possession of the United States . . . is hereby prohibited").  Plaintiffs' claim challenging Defendants' interpretation of the Lacey Act cannot have accrued when the Department promulgated regulations merely repeating the relevant language of the statute.

As a fallback position, Defendants argue that Plaintiffs' claim accrued either when the Department first interpreted the Lacey Act to bar interstate transportation of a listed species (1989) or when the Fish and Wildlife Service first issued a rule purporting to bar interstate transportation of a *reptile* species (1990)—ostensibly the first point at which USARK might have had organizational standing to challenge the rule.[5]  *See* 54 Fed. Reg. 22286, 22,287 (May 23, 1989); 55 Fed. Reg. 17439, 17440 (Apr. 25, 1990).

Defendants offer no convincing reason to treat these prior rules, rather than the 2012 and 2015 Rules, as the agency actions triggering the running of the limitation period under § 2401. The limitation period under § 2401 begins to run on the date of the "final agency action," *Harris v. FAA*, 353 F.3d 1006, 1010 (D.C. Cir. 2004), which the Court of Appeals defines as "one by which rights or obligations have been determined or from which legal consequences will flow," *Mendoza v. Perez*, 754 F.3d 1002, 1018 (D.C. Cir. 2014) (quotation marks omitted).  "[A]n agency's renewal of an earlier decision [that] does not alter the status quo," however, will not "restart the statute of limitations."  *Mendoza*, 754 F.3d at 1018.  The question, then, is whether the 2012 and 2015 Rules were final agency actions that altered the status quo.  Plainly, they were.  The Rules determined the rights of persons in the United States to transport animals of the

---

[5]  There is no evidence before the Court, however, that any member of USARK actually owned or sought to transfer or acquire a brown tree snake during the relevant period of time.

listed species domestically and internationally, and the restrictions they imposed did not exist before the final Rules took effect.  A plaintiff who could lawfully transport reticulated pythons or green anacondas across state lines in 2009 now cannot do so.  The agency's actions that made that so triggered the start of the six-year limitation period here.  *See id.* at 1019 (holding that regulations that had "long existed" as to shepherds and goatherds re-started the limitation period when they were extended to reach cattle herders).

Moreover, if a rule targeting a different species could start the limitation period under these circumstances, the Interior Department could easily avoid facial review of new statutory interpretations.  The Department could simply announce a new interpretation with respect to a listed species not present in the United States (like, for example, the Beni or DeSchauensee's anacondas), allow the six-year limitation period to run, and then promulgate new rules applying that interpretation to far more popular species.  There is no suggestion, of course, that the Department has intentionally pursued such a strategy here, but the effect of its limitation argument is to cut off a presumptively available avenue for judicial review.  *See Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967) ("judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress").  Nothing in the language of § 2401 compels the conclusion that Congress intended to bar facial challenges to rules that extend previous agency interpretations to reach new spheres of previously unregulated activity.

Finally, the Court notes that even were Defendants correct that the final agency action establishing the Interior Department's interpretation of the relevant statutory language took place more than six years before Plaintiffs brought suit, the Department's subsequent actions would render this lawsuit timely because the Department re-opened the issue.  "[A]n agency has reopened a previously decided issue in a case where the agency (1) proposed to make some

change in its rules or policies, (2) called for comments only on new or changed provisions, but at the same time (3) explained the unchanged, republished portions, and (4) responded to at least one comment aimed at the previously decided issue." *Public Citizen v. NRC*, 901 F.2d 147, 150 (D.C. Cir. 1990). Here, the Department clearly "proposed to make some change in its rules or policies" when it issued its proposed rule in 2010. *See* 75 Fed. Reg. 11808 (Mar 12, 2010). The proposed rule "called for comments" on the listing of constrictor species under the Lacey Act. *See id.* at 11811. It "explained the unchanged" interpretation of the Lacey Act that Plaintiffs now challenge. *See id.* at 11808 ("The proposed rule, if made final, would also prohibit any interstate transportation of live snakes, gametes, viable eggs, or hybrids of the nine species currently held in the United States."). And the Department "responded to at least one comment aimed at" that issue. 80 Fed. Reg. 12702, 12732 (Mar. 10, 2015) ("Comment: . . . The Service lacks the authority to restrict interstate transportation and commerce of a listed species between and among continental States. Our response: The Service interprets the Lacey Act as giving us the authority to restrict transportation between any of the States, territories, and other jurisdictions (the District of Columbia) of the United States. We believe that this interpretation is consistent with the language and intent of the statute.").

Because the final agency action at issue was the promulgation of the 2015 Rule, and, in any event, that Rule re-opened the question whether the Department's interpretation of the relevant Lacey Act provision is correct, this suit was timely filed.

2.      *Interpretation of the Lacey Act*

Plaintiffs allege that, by prohibiting interstate transportation of listed snakes, the 2012 and 2015 Rules exceed the authority granted to the Secretary under the Lacey Act. The relevant statutory language states:

> The importation into the United States, any territory of the United States, the
> District of Columbia, the Commonwealth of Puerto Rico, or any possession of the
> United States, *or any shipment between the continental United States, the District*
> *of Columbia, Hawaii, the Commonwealth of Puerto Rico, or any possession of the*
> *United States*, of [certain enumerated species] and such other species of wild
> mammals, wild birds, fish (including mollusks and crustacea), amphibians,
> reptiles, brown tree snakes, or the offspring or eggs of any of the foregoing which
> the Secretary of the Interior may prescribe by regulation to be injurious to human
> beings, to the interests of agriculture, horticulture, forestry, or to wildlife or the
> wildlife resources of the United States, is hereby prohibited.

18 U.S.C. § 42(a)(1) (emphasis added).  Plaintiffs argue that the phrase "any shipment between

the continental United States, the District of Columbia, Hawaii, the Commonwealth of Puerto

Rico, or any possession of the United States" does not encompass transportation of listed species

between two states *within* the "continental United States"—thus, in their view, the Interior

Department lacked authority to prohibit all interstate transportation of the four species at issue in

the 2015 Rule.  Plaintiffs contend that the language and legislative history of the 1960

amendments unambiguously show that Congress "expressly intended to limit" transportation of

listed species "only between all forty-nine continental states as a singular entity and the other

listed jurisdictions (or between those jurisdictions), not within or between the continental states."

Dkt. 28-1 at 20.

In response, Defendants argue that the Interior Department interpretation is compelled by

the plain language of the statute and bolstered by subsequent congressional actions, and, in the

alternative, that it is entitled to deference under *Chevron, U.S.A. v. Natural Resources Defense*

*Council*, 467 U.S. 837 (1984).

a.   *Chevron U.S.A. v. Natural Resources Defense Council*

Under the framework set out in *Chevron*, a court reviewing an agency's interpretation of

a statute first asks "whether Congress has directly spoken to the precise question at issue."  467

U.S. at 842.  "If the intent of Congress is clear, that is the end of the matter."  *Id.*  However, if

"Congress has not directly addressed the precise question at issue . . . the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. The principle in *Chevron* is "rooted in a background presumption . . . 'that Congress, when it left ambiguity in a statute' administered by an agency, 'understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows.'" *City of Arlington, Tex. v. FCC*, 133 S. Ct. 1863, 1868 (2013) (quoting *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 740-41 (1996)).

There is significant reason to doubt, however, whether *Chevron* applies in this context. The Lacey Act is a criminal statute, *see* 18 U.S.C. § 42(b) ("Whoever violates this section, or any regulation issued pursuant thereto, shall be fined under this title or imprisoned not more than six months, or both."), and the Supreme Court recently observed that it "ha[s] never held that the Government's reading of a criminal statute is entitled to any deference," *United States v. Apel*, 134 S. Ct. 1144, 1151 (2014). Instead, "[w]hether the Government interprets a criminal statute too broadly . . . or too narrowly . . . a court has an obligation to correct its error." *Abramski v. United States*, 134 S. Ct. 2259, 2274 (2014) ("We think [the agency's] old position is no more relevant than its current one—which is to say, not relevant at all."). This principle is particularly important where, as here, the government advances an "expansive view" of the scope of activities that will subject citizens to criminal penalties. *Whitman v. United States*, 135 S. Ct. 352, 353 (2014) (Scalia, J., respecting the denial of certiorari). Deferring to such a view would "upend ordinary principles of interpretation," including the "rule of lenity[, which] requires interpreters to resolve ambiguity in criminal laws in favor of defendants." *Id.* In sum, recent Supreme Court authority suggests that "criminal laws are for courts, not for the Government, to construe." *Abramski*, 134 S. Ct. at 2274.

The Court of Appeals has not yet addressed the Supreme Court's recent statements suggesting that *Chevron* deference does not apply to agency interpretations of criminal statutes. On at least two occasions before the Supreme Court's decision in *Apel* and *Abramski*, it did apply *Chevron* to agency interpretations of statutes that imposed criminal penalties.  *See United States v. Kanchanalak*, 192 F.3d 1037, 1047 (D.C. Cir. 1999) (in a criminal case, applying *Chevron* and deferring to FEC's interpretation of statute regulating foreign soft money contributions); *In re Sealed Case*, 223 F.3d 775, 780 (in a criminal case, applying *Chevron* deference to reject statutory interpretation that had been rejected by the FEC).  Although it is not clear whether the Court of Appeals would follow this practice after *Apel* and *Abramski*, there is no need to reach that question here.  Rather, as explained below, the Court concludes that, when Congress amended the Lacey Act in 1960, it did not leave an ambiguity or gap for the Interior Department to fill on the fundamental question whether the Act applies to all interstate shipments of listed species or merely shipments between the continental United States and other portions of the territorial United States.  Thus, regardless whether *Chevron* applies, Plaintiffs have demonstrated a likelihood of success on this claim.

> b.   Plain Meaning of the Statute

Whether proceeding under *Chevron* or not, the Court must "exhaust the traditional tools of statutory construction to determine" the plain language of the statute, including "examination of the statute's text, legislative history, and structure, as well as its purpose."  *Petit v. U.S. Dept. of Educ.*, 675 F.3d 769, 781 (D.C. Cir. 2012) (quotation marks omitted).   This inquiry "begins where all such inquiries must begin: with the language of the statute itself."  *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989).  Here, the statutory phrase "any shipment between the continental United States, the District of Columbia, Hawaii, the Commonwealth of Puerto Rico, or any possession of the United States" does not, standing alone, compel either side's

interpretation.  The jarring juxtaposition of "between" and "or" renders the whole statement grammatically confounding, and neither party's plain-language argument settles the question.

Plaintiffs, for example, could make a strong case that the statute targeted only the spread of invasive species between "the continental United States" and its insular state and territories—areas whose unique biodiversity could be threatened by imports from "the continental United States," and vice-versa.  In this view, the "continental United States" is a single, undifferentiated entity—the portion of the United States located on the North American continent.  On this reading, though, the separate inclusion of the District of Columbia is baffling.  It is unclear why transportation of injurious species between Maryland and the District would merit prohibition while transportation of the same species from Maryland to Virginia could persist unabated.  And although Plaintiffs point to other statutes referring to transportation "between the continental United States *and*" other locales, *see* Dkt. 45 at 5, these statutes shed little light on the proper interpretation of the perplexing "between . . . *or*" construction in the Lacey Act.

Defendants' interpretation, on the other hand, treats the "continental United States" as a set of separate entities between which transportation may be prohibited.  This interpretation avoids the problems noted above, but creates difficulties of its own.  Congress could easily have used much clearer language if it wished to bar all interstate transportation of listed species.  And, even though Hawaii had only recently become a State, it is puzzling that in 1960, Congress listed the "continental United States" and Hawaii separately, rather than simply referring to transportation between the "States."

The problem with Defendants' position is heightened by the fact that Congress used very different language to prohibit the interstate transportation of certain wildlife species in another provision of the 1960 Lacey Act amendments.  Amending former 18 U.S.C. § 43—now codified at 16 U.S.C. § 3372—Congress replaced the phrase "whoever delivers or knowingly receives for

shipment, transportation, or carriage in interstate or foreign commerce" with the following

formulation:

> Whoever delivers, carries, transports, ships, by any means whatever, or knowingly receives for shipment, *to or from any State, territory, the District of Columbia, the Commonwealth of Puerto Rico, any possession of the United States, or any foreign country*[.]

Pub. L. 86-702 (1960) (emphasis added); *see* Dkt. 31-1 at 13-14.  The clear language used to

prohibit interstate shipment of listed species under former § 43 strongly suggests that Congress

did not intend the prohibition on shipments under § 42 to reach as broadly as Defendants

contend.  On balance, Plaintiffs thus offer the slightly better reading of the text.  Still, in light of

the difficulties plaguing both proffered interpretations, the Court concludes that the language of

the statute, standing alone, does not conclusively foreclose either of the interpretations advanced

here.

Because the language of the Lacey Act does not compel either side's interpretation, the

Court looks to the statute's legislative history to determine its plain meaning.  *See Petit*, 675 F.3d

at 781.  In this case, the legislative history of the 1960 Lacey Act amendments unambiguously

supports Plaintiffs' position.

The 1960 amendments to the Lacey Act were drafted by the Department of the Interior

and forwarded to Congress in early 1960.  Dkt. 31-1 at 40.  Prior to the 1960 amendments, the

Lacey Act prohibited "importation into the United States or any Territory or district thereof" of

listed species, but did not address their domestic transportation.  *See* Dkt. 31-1 at 6.  A

Department of the Interior witness who testified before a subcommittee of the House Judiciary

Committee regarding the proposed amendments spoke directly to the purpose of the proposed

language:

> Mr. Parker.  . . . And we have broadened the language *a bit* to prohibit the shipment between the Continental United States and Hawaii, Puerto Rico, and the

15

> Virgin Islands of the Mongoose, for this reason:  Currently, the Mongoose occurs
> in Hawaii, Puerto Rico, and the Virgin Islands . . . and we have no desire to have
> them introduced in the United States other than under strict regulations.

Dkt. 31-1 at 48 (emphasis added).  This explanation supports the conclusion that the relevant

language was added to the statute to prevent the spread of invasive species *between* Hawaii and

overseas possessions *and* the continental United States.  Not only did the Interior Department

witness describe the immediate purpose of the provision in these narrow terms, but he explained

that the prior version of the Lacey Act was broadened only "a bit."  That description is at odds

with Defendants' argument.  Amending a law that previously reached only foreign imports to

criminalize all interstate shipments of listed species would have gone far beyond an incremental

broadening of the statute's scope.

The Department of the Interior's testimony also describes the amendment in terms that

avoid the textual ambiguity described above.  According to the Department's witness, the

amendment "prohibit[s] the shipment between the Continental United States *and* Hawaii, Puerto

Rico, and the Virgin Islands."  *Id.* (emphasis added).  Although directed at the problem of the

mongoose, this description of the law's reach is unambiguous:  It reaches shipments between

"the Continental United States" *and* the offshore portions of the territorial United States.

Other statements in the legislative history confirm that the language was not intended

dramatically to expand the scope of conduct prohibited under the Lacey Act.  Before the 1960

amendments, the Lacey Act barred "importation into the United States or, any Territory or

district thereof" of listed species, but did not address their domestic transportation.  Dkt. 31-1 at

12-13.  The Department of the Interior's statement describing the draft legislation as "a bill to

*clarify* certain provisions of the criminal code," *id.* at 10 (emphasis added), suggests that the

agency that drafted the legislation did not intend to ask that Congress criminalize a broad swath

of previously legal activity. [6]  Importantly, the House and Senate committee reports on the legislation confirm that view.  The House Report described the legislation as "clarifying certain provisions of the criminal code relating to the importation or shipment of injurious [animals]," and noted that the "amendments [were] technical in nature and designed to bring the legislation in accord with the general structure of title 18, United States Code."  Dkt. 31-1 at 7-8.  The Senate Report used very similar language.  *Id.* at 15-16 ("The purpose of the bill is to clarify and to make more inclusive, in the interest of good administration and enforcement, certain provisions of the Criminal Code . . . .").

Even more striking is the absence in either the House or Senate Reports of any discussion of whether, or how, the law might apply to purely domestic shipments within the continental United States.  When describing which agencies would implement the amendment, the Department of the Interior stated that the Secretary would "establish a permit system," the Department "would need to check the facilities of applicants for such permits, and also issue the permits," and "[i]t would fall to the U.S. Customs Service to effect inspection *at the points of entry* and reject or admit such items on the basis of existing regulations and appropriate related permits."  *Id.* at 43 (emphasis added).  The Interior Department never described any plan or proposed delegation of authority to investigate interstate shipment of listed species.

The Department's testimony also indicates that it was aware that criminal statutes are interpreted narrowly and that it took care when drafting the legislation to speak unambiguously

---

[6]  Other portions of the Department's testimony note that the amendment was "aimed [at reducing] more effectively the hazards arising from the importation of injurious wild animals, [at curtailing] traffic in such species, [at defining] the types of wild animals and methods of transportation to which the code applies, and otherwise [at clarifying] the code in the interest of good administration and law enforcement."  Dkt. 31-1 at 40-41.  None of this, however, addresses the scope of the "traffic" that Congress sought to "curtail."  This more general language, moreover, does not distinguish between the amendments to § 42, which previously applied only to imports, and former § 43, which previously applied to interstate transportation of animals taken or possessed in violation of state or federal law.

where it intended to expand the scope of prohibited conduct.  When discussing amendments to

former § 43, which prohibits transportation of species possessed or taken in violation of state or

federal law, the Department noted that it "must be borne in mind that the statute is penal in

nature and under a well-established rule of construction it must be construed strictly and all

reasonable doubts in its interpretation resolved in favor of persons accused of violating its

provisions."  Dkt. 31-1 at 45.  It strains credulity to imagine that criminal legislation drafted and

enacted with this principle in mind would adopt a sweeping expansion of the conduct it

prohibited through the (at best) obscure language at issue here, without *any* mention by the

Department of the Interior or the congressional committees of jurisdiction.  The Court has been

unable to identify any evidence—and Defendants have not pointed to any—that Congress or the

Department of the Interior believed in 1960 that the Lacey Act amendments would prohibit all

interstate transportation of listed species.

The narrow reach of the 1960 amendments is confirmed, moreover, by the Department of

the Interior's consistent interpretation in the two decades following their enactment.  Beginning

in 1973, the Department issued a series of proposals that would have effectively reversed the

species-designation procedure under the Lacey Act:  Rather than enumerate a list of injurious

species, the Interior Department proposed categorizing all species as injurious by default,

exempting only those it determined to be "low risk."  *See* 38 Fed. Reg. 34970 (Dec. 20, 1973).

In the course of this rulemaking effort, the Department repeatedly proposed rules that explicitly

adopted the narrow reading of the Lacey Act's prohibition on shipments of listed species.  *See* 40

Fed. Reg. 7935, 7936 (Feb. 24, 1975) ("Interstate shipments are not affected, except shipments

between noncontinental parts of the United States (island ecosystems such as Hawaii and Puerto

Rico) and the continental United States."); 42 Fed. Reg. 12972, 12974 (Mar. 7, 1977) ("Pursuant

to the statute, the proposed regulations would also prohibit the shipment of injurious wildlife

between any two of the following geographic areas: the continental United States, the State of Hawaii, Puerto Rico, or any possession of the United States.").

A Department representative confirmed this view in a 1974 hearing before the House Subcommittee on Fisheries and Wildlife Conservation and the Environment.  When asked how the proposed rule would address "the problem of exotic species that are already in this country," a witness from the Fish and Wildlife Service testified that "there [was] no restriction . . . in section 42 of the Lacey Act to interstate shipments, with the possible exception of restrictions from areas off the continental United States, such as Puerto Rico, the Virgin Islands, and Hawaii."  Dkt. 28-3 at 3.  Thus, "the breeder of pheasants, or black buck, or what have you, in the United States [would] not have any restrictions on the movement or possession of the animals that are already present in the United States.  The restrictions . . . apply to importations." *Id.*

The Department of the Interior did not ultimately adopt its injurious-by-default approach in a final rule, but its statements in proposed rules and in testimony before Congress made clear that the Department did not understand the Lacey Act to prohibit interstate shipments of injurious species, with the "possible exception" of shipments between outlying territories and the continental United States.  This evidence reflects the view of the agency that drafted the 1960 Lacey Act amendments and confirms the clear import of the amendments' legislative history.  It also vindicates the better reading of the admittedly unclear language of the Lacey Act itself.  In light of these considerations and applying the "traditional tools of statutory construction," the Court concludes that Plaintiffs' interpretation reflects the unambiguous intent of Congress.  Thus, even were *Chevron* to apply, Plaintiffs would prevail at step one of the analysis because Congress did not leave a gap for the agency to fill.

c.   Subsequent Legislative History

19

Defendants base their contrary view of the legislative history on developments that took place decades after the language at issue was enacted.   At some point in the 1980s, the Interior Department abandoned the interpretation of the relevant language that it had previously presented to Congress and applied for approximately two decades.   As noted above, in 1989 the Department began inserting language in rules listing species as injurious that purported to prohibit all interstate transportation of the listed species.   *See* 54 Fed. Reg. 22286, 22287 (May 23, 1989) ("[I]nterstate transportation [of mitten crabs] . . . for any purpose not otherwise permitted, would be prohibited.").   This view has been reflected in the legislative history of subsequent amendments to the Lacey Act.   In one case, Congress passed a law exempting a water district's pipeline from the Lacey Act because the pipeline would transport a listed species across state lines.   In two other cases, Congress has passed laws explicitly listing species under the Act based, in part, on at least some members' understanding that the Act would prohibit interstate transportation of the newly listed species.

### i.   *The 1990 zebra mussel legislation*

The Department's new view was promptly reflected in the legislative history of an amendment to the Lacey Act.   In 1990, Congress passed the Nonindigenous Aquatic Nuisance Prevention and Control Act, Pub. L. 101-646, which, among other provisions aimed at limiting the spread of the zebra mussel in the United States, amended 18 U.S.C. § 42 to list the zebra mussel as an injurious species.

Congress was alarmed that the zebra mussel had, in the two years since it was first discovered in the United States, "spread over a 10,000 square mile area, infesting the Lake Erie shoreline from Detroit to Buffalo."  Dkt. 44-1 at 11 (1990) (statement of Sen. Specter).  Zebra mussels are unimposing mollusks about "the size of a quarter."  *Id.*  They can affix themselves to almost any surface, however, and form massive agglomerations large enough to block water

intake pipes. *Id.* They also reproduce prolifically and compete with local fish populations for nutrients—so successfully that members of Congress predicted that economic damage attributable to the zebra mussel could reach as much as $5 billion in the 1990s. *Id.* ("Projections of the economic damage caused by the zebra mussel are $500 million each year in Lake Erie alone and $3 to $4 billion for all areas impacted by the mussels in the next 10 years."); *see also id.* at 11-12 ("Some estimate that the combined costs of the damage to infrastructure and fishery of the Lakes could climb to $5 billion over the next 10 years.") (statement of Sen. Glenn); Pub. L. 101-646 § 1002(a) ("the potential economic disruption . . . has been estimated at $5,000,000,000 by the year 2000, and the potential disruption to the diversity and abundance of native fish and other species could be severe").

Congress also evinced concerns about the spread of the zebra mussel outside the Great Lakes. Senator Glenn warned that it was "only a matter of time before the zebra mussel infestation spreads to two-thirds of the Nation's freshwater system unless we work to control it." *Id.* at 12; *see also id.* at 11 ("Experts anticipate that within 10 years this creature is likely to be found in two-thirds of the United States") (statement of Sen. Specter); Pub. L. 101-646 § 1002(a) ("the zebra mussel . . . if left uncontrolled, is expected to infest over two-thirds of the continental United States through the unintentional transportation of larvae and adults by vessels operating in inland waters"). Senator Glenn explained, "[t]he bill also addresse[d] other probable pathways of zebra mussel spread. In particular, it amende[d] the Lacey Act to prevent the *interstate transportation* of the zebra mussel in commerce." Dkt. 44-1 at 12 (emphasis added). The Senate committee report on the zebra mussel legislation noted Congress's finding that the zebra mussel "currently infest[ed] the lower Great Lakes basin with the potential to spread to areas outside the basin." S. Rep. 101-523 (1990). Significantly, the report also stated that the

provision amending the Lacey Act "would lead to the prohibition of the *interstate transport* of zebra mussels for commercial purposes." *Id.* (emphasis added).

There is, however, at least one statement in the legislative history of the bill evincing the Department's original understanding of the Lacey Act's scope. In written testimony on a similar bill introduced in the House of Representatives, the Assistant Secretary for Fish and Wildlife and Parks stated that "designation of zebra mussels as injurious wildlife" would "have no [e]ffect on the interstate transport of zebra mussels." Dkt. 50-1 at 32. She made an identical statement in written testimony before a Senate subcommittee. Dkt. 50-2. This is inconsistent with the Interior Department's almost-concurrent statements in promulgated rules indicating that the effect of a listing under the Lacey Act would be to ban interstate transportation of the listed species. *See* 54 Fed. Reg. 22286, 22287 (May 23, 1989); 55 Fed. Reg. 17439, 17440 (Apr. 25, 1990). It injects at least some uncertainty into the 1990 legislative record.

### ii. The 2010 bighead carp legislation

Twenty years after Congress amended the Lacey Act to list the zebra mussel as an injurious species, it enacted the Asian Carp Prevention and Control Act to target another invasive species. *See* Pub. L. 111-307 (2010). Once again, the legislative history of its amendment suggested that Congress understood the Lacey Act to prohibit all interstate transportation of listed species. Bighead carp—a species of Asian carp—can grow to five feet in length and more than 100 pounds, and they eat up to 20 percent of their body weight per day in plankton, depriving native aquatic species of needed nutrients. *See, e.g.*, Margaret E. Vroman, *The Asian Carp: An Imminent Threat to the Great Lakes?*, 90 Mich. Bar J. 25, 26 (2011). The species was introduced into the United States from China in the 1970s "to eat the algae clotting fish farms in the South," but "a series of floods over the years helped them to escape their controlled environment." Dan Barry, *On an Infested River, Battling Invaders Eye to Eye*, The New York

Times, September 15, 2008 at A13 ("Cue the 'Jaws' theme.").  The species received wary

attention as it spread north up the Mississippi river in the decades following its introduction, but

concern intensified dramatically after researchers discovered bighead carp DNA "in the Great

Lakes vicinity" and past an electric dispersal barrier intended to repel the fish.  S. Rep. 111-181

(2010).

These events spawned considerable congressional concern.  Representatives noted that

"these enormous fish have become a menace to native species and their habitats," Dkt. 44-5 at 2

(remarks of Rep. Poe), and worried that the bighead carp would "threaten not only the

commercial but recreational fishing" throughout the Great Lakes, *id.* (statement of Rep.

Conyers); *see also id.* at 3 ("Asian carp are the single greatest biological threat to [the Great

Lakes ecosystem].") (statement of Rep. Biggert).  Importantly, Congress appears not to have

acted under the impression that it could eradicate the bighead carp from the Mississippi—

instead, members focused on the need to "do everything possible to prevent these invasive fish

from harming other areas of the United States."  *Id.* (statement of Rep. Pitri).

Congress's solution to the problem was a single-purpose law designating the bighead

carp as an injurious species under the Lacey Act.  The legislative history contains a substantial

number of statements suggesting that Congress understood the listing would prohibit interstate

transportation of bighead carp.  The Senate Report states that the legislation would "add the

bighead carp . . . to the list of injurious species that are prohibited from being traded in interstate

commerce or imported into the United States."  S. Rep. 111-181 (2010).  Representative Conyers

described the bill as "prohibit[ing] importation and interstate shipment of certain species of carp

and . . . add[ing] the bighead variety of the species commonly known as Asian carp to the list of

injurious species that are prohibited from being shipped in or imported into the United States."

Dkt. 44-5 at 2.  Several other members of Congress made similar statements.  *See id.* ("This

designation prohibits the importation and interstate shipment of Asian carp.") (statement of Rep. Poe); *id.* at 3 ("For many years . . . a number of us from the Great Lakes region have been urging the Fish and Wildlife Service to include bighead carp on the list of injurious species under the Lacey Act and so minimize the risk of further harm by prohibiting the importation and interstate transportation of live Asian carp without a permit.") (statement of Rep. Levin); 155 Cong. Rec. 7319 (2009) ("Listing the Bighead carp as injurious would minimize the risk of intentional introduction by prohibiting the importation and interstate transportation of live Asian carp without a permit") (statement of Sen. Levin).

Plaintiffs note that other representatives who spoke on the bill did not indicate whether they believed that a listing under the Lacey Act barred interstate transportation of the listed species. *See* Dkt. 44-5 at 3 (Dec. 1, 2010) ("This legislation takes an important step in restricting the transportation of the Big Head Asian Carp by listing it as an injurious species under the Lacey Act, prohibiting this fish from being shipped or imported into the United States.") (Statement of Rep. Kaptur); *id.* (bill would add bighead carp to the "list of injurious species under the Lacey Act and prevent their sale or importation into the United States") (statement of Rep. Biggert).  Although Plaintiffs are correct that both mentioned importation without discussing interstate shipments, both Representative Biggert and Representative Kaptur previously signed a letter to the Fish and Wildlife Service ("FWS") stating that "[l]isting these fish would . . . prohibit interstate transportation."  Dkt. 44-3.  Plaintiffs have not identified any statement in the legislative history of the bighead carp bill that disputes or contradicts the Senate report's characterization of the law.

### iii.  The 2012 Lake Texoma legislation

A third, more recent legislative development also suggests that recent Congresses have understood the Lacey Act to reach interstate transportation.  In 2012, Congress passed a law that

exempted certain water transfers between Oklahoma and Texas from the Lacey Act.  *See* Lake

Pontchartrain Basin Restoration Program, § 5, Pub. L. 112-237 (Dec. 28, 2012).  In 1989, the

North Texas Municipal Water District (the "Water District") obtained approval to construct a

pumping station that would transport water from Lake Texoma, a reservoir on the Red River, to

supply a reservoir in the Trinity River system.  *See* H.R. Rep. 112-657 (2012).  Unlike the Red

River, which forms much of the border between Oklahoma and Texas and flows east into the

Mississippi, the Trinity River flows south through eastern Texas into the Gulf of Mexico.  In

2000, a realignment of the Texas-Oklahoma border left a portion of the Lake Texoma water

intake facility in Oklahoma.  *Id.*  Thus, when zebra mussels were discovered in Lake Texoma in

2009, the FWS advised the Water District that transfer of water out of Lake Texoma via the

intake facility would constitute a "violation of the Lacey Act because invasive zebra mussels

would be transported across state lines" and into the uninfested Trinity River basin.  *Id.*

The Water District eventually determined that it would construct a closed pipeline

connecting the pumping station on Lake Texoma to a water treatment facility in Texas, "where

the zebra mussels w[ould] be completely destroyed."  *Id.*  The FWS, however, "indicated [it]

lack[ed] the statutory authority to tell the Water District that this pipeline w[ould] comply with

the Lacey Act."  *Id.*  The proposed legislation "solve[d]" this "problem . . . by recognizing that

the Lacey Act does not apply to the Lake Texoma water transfers."  *Id.*  In a separate statement,

Representative Markey also noted that zebra mussels were "a species designated by the Fish and

Wildlife Service as 'injurious' and therefore illegal to transport across state lines," and

emphasized that, although he supported the proposed legislation, he believed it "should not set a

precedent for making exemptions to the Lacey Act."  *Id.*  This legislation, at a minimum, further

evidences recent congressional awareness of the Interior Department's interpretation of the

Lacey Act.

d.   Effect of the Subsequent History

The parties disagree about the significance of these post-enactment congressional actions. According to Plaintiffs, the Department of the Interior's interpretations of the Lacey Act in the 1970s confirm what Plaintiffs view to be the better reading of the statutory language—that the Act does not bar interstate transportation of listed species within the continental United States. The developments after 1980, in their view, have no interpretative significance.  Dkt. 45 at 6. Plaintiffs contend that these events reflect isolated congressional responses to "discrete exigencies," rather than any intent to re-evaluate the scope of the Lacey Act for all purposes.  *Id.* Plaintiffs emphasize that the zebra mussel and bighead carp bills received comparatively little attention when they were enacted, *id.* at 8, and argue that, in any event, neither is sufficient to establish that Congress ratified the Interior Department's more recent interpretations of the statute.  Although they acknowledge that "reenactment" of a statute "without change after a course of administrative interpretation is tantamount to legislative ratification of the interpretation," *Thompson v. Clifford*, 408 F.2d 154, 164 (D.C. Cir. 1968), they argue that the Lacey Act has never been "reenacted" or so significantly amended to establish ratification, *see* Dkt. 45 at 10-11 (citing *Pub. Citizen, Inc. v. Dep't of Health & Human Servs.*, 332 F.3d 654, 668 (D.C. Cir. 2003), *and Alexander v. Sandoval*, 532 U.S. 275, 292 (2001)).  They also dispute that Congress was, as a whole, sufficiently aware of Department's more recent interpretations of the Lacey Act to support an inference of ratification.  *See* Dkt. 45 at 11.

Defendants, unsurprisingly, view the significance of these developments differently. They note that the Department of the Interior's statements in proposed rules and before Congress in the 1970s were made in the course of an abortive regulatory effort that would have greatly expanded the number of species listed under the Lacey Act.  Although a more circumspect view of the interstate transportation bar may have made sense in the context of that proposed scheme,

they assert that the Department was free to assume its current position when it abandoned that

effort.  *See Chevron*, 467 U.S. at 863 (when an agency changes its interpretation of a statute, the

new interpretation is still entitled to deference so long as it is reasonable).  Defendants also stress

that Congress actually amended the Lacey Act to list additional species after the committee

reports they cite, and that the amendments involved species that were already present in the

continental United States.  Indeed, in Defendants' view, the zebra mussel and bighead carp

amendments bear more weight than normal "post-enactment legislative history" because they

amended the precise statute at issue and, by refraining from changing the language of the

interstate shipment provision, declared "the intent of [the] earlier statute."  *Red Lion*

*Broadcasting Co. v. FCC*, 395 U.S. 367, 380-81 (1969) ("Subsequent legislation declaring the

intent of an earlier statute is entitled to great weight in statutory construction").  According to

Defendants, those two amendments show that Congress understood the Lacey Act to bar all

interstate transportation of listed species and that Congress "ratified" that permissible

interpretation of the law.  Dkt. 48 at 5.

In general, "'the views of a subsequent Congress form a hazardous basis for inferring the

intent of an earlier one.'"  *Public Citizen Health Research Grp. v. FDA*, 704 F.2d 1280, 1289

n.26 (D.C. Cir. 1983) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania Inc.*, 447 U.S.

102, 117 (1980); *see also O'Gilvie v. United States*, 519 U.S. 79, 90 (1996) ("[T]he view of a

later Congress cannot control the interpretation of an earlier enacted statute.").  The actions of a

subsequent Congress can, however, inform the meaning of an earlier enacted statute under two

narrow circumstances:  Congress may ratify an administrative interpretation of a law when it re-

enacts or substantially amends the earlier enactment, and Congress may repeal or amend a law

by implication.  Neither approach to interpretation is favored under the law, and both are subject

to significant limitations.

27

### i. Ratification

Defendants frame their argument in terms of congressional ratification of the Department of the Interior's broad interpretation of the Lacey Act.  Under the ratification canon, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."  *Public Citizen v. FAA*, 988 F.2d 186, 194 (D.C. Cir. 1993) (citation and quotation marks omitted).  Three considerations, however, weigh—to varying degrees—against application of that canon here.

First, the ratification canon is of "little assistance" where Congress has not re-enacted the entire statute at issue or significantly amended the relevant provision.  *See Public Citizen, Inc. v. Dep't of Health and Human Servs.*, 332 F.3d at 668.  As the Supreme Court has explained, "when . . . Congress has not comprehensively revised a statutory scheme but has made only isolated amendments," a court cannot "assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of the [administrative] statutory interpretation."  *Alexander v. Sandoval*, 532 U.S. at 292 (citations and internal quotations omitted).  Here, Congress did not re-enact the entire Lacey Act and did not amend the relevant language in any of the three subsequent enactments upon which Defendants rely.  Defendants point to *Kay v. FCC*, 443 F.2d 638, 646-47 (D.C. Cir. 1970), where the Court of Appeals concluded Congress had ratified an interpretation of one statutory provision by amending a related provision.  In that case, however, the Court of Appeals had already concluded that the administrative interpretation was, in any event, the better reading of the statute, and the Court merely concluded that related legislative amendments made after Congress "fully reviewed" the agency's rulings provided some additional "persuasive weight."[7]  *Id.* at 646.

---

[7]  To the extent the *Kay* decision includes more sweeping dicta ("a consistent administrative interpretation of a statute, shown clearly to have been brought to the attention of Congress and

Second, the Supreme Court has cautioned that courts should be "extremely hesitant to
presume general congressional awareness of the [agency's] construction based only upon a few
isolated statements in the thousands of pages of legislative documents." *SEC v. Sloan*, 436 U.S.
103, 121 (1978).  As the Court explained in *TVA v. Hill*, 437 U.S. 153 (1978), its hesitation to
presume congressional awareness in *Sloan* came against the backdrop of "a 34-year-old practice
of the Securities and Exchange Commission," and "despite the fact that the Senate Committee
having jurisdiction over the Commission's activities had long expressed approval of the
practice." *Id.* at 192 (emphasis omitted); *see also Sloan*, 436 U.S. at 121 ("[L]anguage in a
Committee Report, without additional indication of more widespread congressional awareness, is
simply not sufficient to invoke the presumption in a case such as this.").  Here, although it is
clear that many members of Congress were aware of the Interior Department's broad
construction of the Lacey Act at the time Congress enacted each of the three subsequent
statutes—and, indeed, that construction is referenced in committee reports, *see* S. Rep. 101-523
(1990); S. Rep. 111-181 (2010); H.R. Rep. 112-657 (2012)—the legislative record is not
uniform, *see* Dkt. 50-1 at 32, and, more importantly, the Supreme Court has suggested that even
this type of broad awareness of an administrative practice may not be enough for purposes of the
ratification canon.  The Court need not, however, decide this issue in light of the remaining
hurdles Defendants face.

   The third difficulty with Defendants' efforts to invoke the ratification doctrine is the

---

not changed by it, is almost conclusive evidence that the interpretation has congressional
approval"), *Kay*, 443 F.2d at 646-47, that language has been superseded by more recent Supreme
Court and Court of Appeals precedents, *see, e.g.,* S*olid Waste Agency v. U.S. Army Corps of
Eng'rs*, 531 U.S. 159, 169 (2001) ("Although we have recognized congressional acquiescence to
administrative interpretations of a statute in some situations, we have done so with extreme
care."); *Alexander v. Sandoval*, 532 U.S. at 292 ("It is impossible to assert with any degree of
assurance that congressional failure to act represents affirmative congressional approval of [a]
statutory interpretation.") (quotation marks and citations omitted); *Public Citizen, Inc. v. Dep't of
Health & Human Servs.*, 332 F.3d at 668.

clearest, and it is dispositive.  The Supreme Court has repeatedly recognized that "re-enactment cannot save a regulation which contradicts the requirements of the statute itself."  *Leary v. United States*, 395 U.S. 6, 24 (1969) (quotation marks and alterations omitted); *see also Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991) ("Where the law is plain, subsequent reenactment does not constitute an adoption of a previous administrative construction.").  These cases rely on the basic principle that Congress cannot "'add to or expand'" the scope of a statute whose meaning is plain without affirmatively amending the law.  *Leary*, 395 U.S. at 25 (quoting *Comm'r of Internal Revenue v. Acker*, 361 U.S. 87, 93 (1959)).  Following *Sloan*, 436 U.S. at 122, which questioned, in dicta, whether a subsequent re-enactment could trump "the rather plain meaning of" the statutory language at issue, the Court of Appeals has observed "that Congress cannot by its silence ratify an administrative interpretation that is contrary to the plain meaning of the Act."  *Ashton v. Pierce*, 716 F.2d 56, 63 (D.C. Cir. 1983).  The principle applies, moreover, even where the competing construction of the Act is "perhaps not an impossible" one, *Sloan*, 436 U.S. at 112, and where a court arrives at the "plain meaning" by relying, at least in part, on "the legislative history," *Ashton*, 716 F.2d at 61-63.

Because the Court has concluded that the meaning of the Lacey Act's relevant language was clear at the time of its enactment in 1960, Congress cannot be deemed to have adopted an alternative construction of the statute through ratification, particularly where it did not amend— or even discuss—the relevant language.  Applying the ratification doctrine to change the plain meaning of a statute crosses the line from embracing a legitimate interpretation of the law to changing its meaning.  Accordingly, the relevant question is not whether Congress *ratified* the Department of the Interior's interpretation but, rather, whether Congress *amended* the Lacey Act.

### ii.  Implied amendment

Congress has not changed the relevant language of the Lacey Act since it was enacted in

1960.  Thus, the meaning of the phrase "any shipment between the continental United States, the

District of Columbia, Hawaii, the Commonwealth of Puerto Rico, or any possession of the

United States" must remain unchanged unless it was implicitly amended when Congress enacted

the 1990 (zebra mussels), 2010 (bighead carp) or 2012 (water transfers from Lake Texoma) laws.

The hurdle of establishing an amendment by implication, however, is a high one.  Although more

frequently invoked in the context of implied repeals, the standards are "conceptually identical,"

*Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 661-62 (D.C. Cir. 2011), and

"implied amendments are no more favored than implied repeals."  *Nat'l Ass'n of Home Builders

v. Defenders of Wildlife*, 551 U.S. 644, 664 n.8 (2007).  "A new statute will not be read as wholly

or even partially amending a prior one unless there exists a positive repugnancy between the

provisions of the new and those of the old that cannot be reconciled."  *Id.* (quotation marks

omitted).  An amendment or repeal "is to be implied only if necessary to make the (later enacted

law) work, and even then only to the minimum extent necessary."  *Howard v. Pritzker*, 775 F.3d

430, 437 (D.C. Cir. 2015) (quotation marks omitted).  Accordingly, "when two statutes are

capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional

intention to the contrary, to regard each as effective."  *Id.* (quotation marks omitted); *see also

Mittleman v. Postal Regulatory Comm'n*, 757 F.3d 300, 306 (D.C. Cir. 2014) ("We will not infer

a statutory repeal unless the later statute expressly contradicts the original act or unless such a

construction is absolutely necessary in order that the words of the later statute shall have any

meaning at all.") (alterations omitted) (quoting *Nat'l Ass'n of Home Builders*, 551 U.S. at 662-

63).

      As the Supreme Court explained in *Blanchette v. Connecticut General Insurance

Corporations*—quoting Judge Friendly's opinion for the lower court—the demanding standard

for finding an amendment by implication "rests on a sound foundation."  419 U.S. 102, 134

(1974) (quotation marks omitted).  In particular, courts presume that "Congress had given serious thought to the earlier statute," and, as a result, "[b]efore holding that the result of the earlier consideration has been repealed or qualified, it is reasonable for a court to insist on the legislature's using language showing that it has made a considered determination to that end." *Id.* at 134 (quotation marks omitted).  None of the subsequent enactments Defendants identify satisfy this high standard.

The most recent enactment—the statute exempting water transfers from Lake Texoma— constitutes a pragmatic congressional response to the Interior Department's interpretation of the statute in one particular case.  The Department took the position that operation of the Water District's new pipeline would violate the Lacey Act.  Congress responded to that concern and exempted the water transfers at issue from the Act.  It is clear that Congress concluded that the Lacey Act should not apply to those water transfers.  It is far from clear, however, that Congress as a whole concluded that the Lacey Act should be construed to prohibit *all* interstate transfers of listed species.  Rather, it seems far more likely that Congress merely concluded that the Interior Department's view of the law—whether right or wrong—should not force the Water District to abandon its pipeline.  In any event, Congress did not clearly express an intent to amend the Lacey Act, and there is no "positive repugnancy" between Congress's plain intent in 1960 and the 2012 legislation. *Blanchette*, 419 U.S. at 134.  Under both enactments, the interstate transportation of zebra mussels through the Water District's pipeline would be permitted.

Although Congress's 1990 amendment listing zebra mussels under the Lacey Act expanded, rather than limited, the reach of the statute, it is also insufficient to establish an implied amendment.  Congress listed the zebra mussel among a number of other provisions intended to staunch the flow of zebra mussels into the United States and to curb their spread within the country. *See* Pub. L. 101-646.  Perhaps most significantly, Congress adopted a system

requiring vessels entering the United States from international waters to exchange their ballast water at sea before "enter[ing] a United States port on the Great Lakes." *Id.* § 1101.  Because Congress was concerned both with the continuing importation of zebra mussels and with their interstate transportation, listing the zebra mussel under the Lacey Act would have significantly furthered Congress's purpose by imposing a criminal penalty for the importation of the species.  Thus, as with the 2012 legislation, Congress did not clearly express an intent to amend the Lacey Act in 1990, and the 1990 legislation can be given effect without disturbing the plain intent of the 1960 Lacey Act amendments.  As a result, the 1990 legislation also does not meet the high standard for amendments by implication.

Plaintiffs' strongest argument rests on the significance of the 2010 amendment listing bighead carp as an invasive species.  The bighead carp was already well established in regions of the continental United States when Congress added it to the list of injurious species under the Lacey Act in 2010.  *See* S. Rep. 111-181 at 1 (2009) (the bighead carp "is now established in the Ohio, Mississippi and Missouri Rivers . . . .  Since the Mississippi River is connected to the Great Lakes by canal, bighead carp threaten to infest the Great Lakes").  There is no evidence that simply prohibiting importation of the bighead carp into the United States or its transportation between the insular portions of the United States and the continental United States would have slowed the species' spread from the Mississippi River system into the Great Lakes.  And the legislative history of the 2010 amendment makes clear that at least the relevant committees and interested members believed—and intended—that the law would have the effect of prohibiting interstate transportation of the species.

As Defendants concede (Dkt. 48 at 6, n.6), "there is no irreconcilable conflict between the 1960 amendments and the . . . 2010 amendments."  It is logically possible to apply both laws simultaneously and to give both enactments meaning:  Bighead carp initially arrived in the

United States as an imported species, and under the 1960 amendments their listing would still criminalize any further importation.  Plaintiffs argue, moreover, that even prohibiting interstate transportation of the species would not have been particularly effective—the major threat posed by bighead carp was not a bustling domestic trade in the species, but rather that fish would cross from the Mississippi River system into Lake Michigan "by their own volition."  Dkt. 45 at 8 n.7. It is nonetheless evident that the principal purpose of the 2010 amendment was to prohibit interstate transportation of bighead carp.

Although the question is close, the Court concludes that even the bighead carp legislation did not impliedly amend the Lacey Act.  The relevant question is not whether Congress intended to ban interstate transportation of bighead carp, but, ultimately, whether it intended to criminalize the interstate transportation of *all* species currently listed under the Lacey Act, and *all* species that the Interior Department or Congress might someday list.  Notably, the change from the 1960 version of the Lacey Act—which criminalized only imports and shipments between the insular and the continental United States—to the version of the law that Defendants posit—which would bar all interstate transportation of listed species—is a fundamental one.  The authority to regulate imports is far narrower than the power to regulate interstate activity.  Had Congress intended to make or embrace such a significant change in the law—even implicitly—one would have expected to see some debate or mention of the expansion.  As the Supreme Court has observed, "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions— it does not, one might say, hide elephants in mouseholes."  *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

This absence of any mention of an expansion in the scope of the law, moreover, is all the more troubling because the Lacey Act is a criminal statute.  "[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation

of the community, legislatures and not courts should define criminal activity." *United States v. Bass*, 404 U.S. 336, 348 (1971). Importantly, this maxim follows from "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." *Id.* (quoting H. Friendly, Mr. Justice Frankfurter and the Reading of Statutes, in Benchmarks 196, 209 (1967)). Here, there is no evidence that Congress ever affirmatively considered whether the interstate shipment of listed species should constitute a crime. To the contrary, the history of the 2010 amendment adding bighead carp to the list of injurious species suggests that it is equally, if not more, plausible that Congress merely intended to apply whatever existing tools were available to stem the spread of the carp. That is a very different judgment than the decision that the Lacey Act should apply in all cases to interstate shipments. Because Congress simply *assumed* that the Lacey Act applied to interstate shipments—presumably based on input from the Department of the Interior, which by 2010 had adopted that interpretation of the law—it never considered whether it *should* apply to all interstate shipments. Given the demanding standard for finding amendments by implication, the Court concludes that this was not enough to change the meaning of the law.

The Supreme Court's rejection of an implied amendment argument in *TVA v. Hill*, 437 U.S. 153 (1978), further supports this conclusion. There, Congress learned that a dam under construction on the Little Tennessee River would threaten the population of endangered fish— the snail darter—that lived only in that river. *Id.* at 158-59. Congress continued to appropriate funds to the project, and both the Senate and House Appropriations Committees issued reports expressly stating their view that the Endangered Species Act did not prohibit the Project's completion. *Id.* at 170-71. The Supreme Court nonetheless held that the project should be enjoined, reasoning that the "language, history and structure" of the Endangered Species Act indicated "beyond doubt that Congress intended endangered species to be afforded the highest of

35

priorities." *Id.* at 174.

The Court rejected the TVA's argument that three appropriations statutes dedicating millions of dollars to the project after the snail darter was listed as an endangered species impliedly repealed the Endangered Species Act. Aspects of its reasoning are distinguishable from this case: For example, the Court noted that appropriations measures may be particularly poor bases for inferring Congress's intent to amend substantive legislation, and it questioned the extent to which members of Congress who did not sit on the Appropriations Committees were aware of the Committees' interpretations. "Quite apart from the foregoing factors," however, the Court was "unable to find that in this case the earlier and later statutes [were] irreconcilable." *Id.* at 192 (quotation marks omitted). It noted that "TVA confidently reported to the Appropriations Committees that efforts to transplant the snail darter appeared to have been successful," which would have given "those committees some basis for the impression that there was no direct conflict" with the Endangered Species Act. Similarly, the Court considered that the district court's decision in favor of the government would have given the Committees some hope that the project would survive review, thus justifying the appropriation of funds for its completion. *Id.*

Even if not on all fours with the present dispute, *Hill* provides relevant guidance. In both cases, Congress enacted subsequent legislation with an understanding detailed in the legislative history of how the new law would interact with an earlier statute. In both cases, understanding of the law set forth in committee reports was mistaken. And in both cases, the mistake substantially undermined the effect of the subsequent legislation. Indeed, if anything, the intent of the subsequent Congress was more completely frustrated in *Hill*: The specific appropriation at issue was for the construction of a dam that the Endangered Species Act flatly prohibited. Here, listing the bighead carp under the Lacey Act, as it was amended in 1960, would further

Congress's intended result by at least prohibiting additional importation of the species.  The Court concludes that, as in *Hill*, even where Congress acts against the backdrop of an understanding of the law that is set forth in committee reports and that understandably bears a close connection to Congress's current legislative purpose, more is required to amend a pre-existing statute.

If it had faced the question, the 2010 Congress may well have decided as a general matter to criminalize importation of species listed under the Lacey Act—or it may have declined to do so.  But Congress did *not* decide that broader question, and there is nothing in the legislative history of the 2010 amendment to suggest that Congress considered it at all.  A debate on whether to amend the Lacey Act to bar interstate transportation of all listed species would raise policy issues unrelated to the spread of the bighead carp: how the listing or potential listing of commercially traded species might affect the economy, for example, or whether the existing restrictions on interstate transportation of illegally possessed species might, in conjunction with state law, be adequate to achieve Congress's purpose.  *See* 16 U.S.C. § 3372(a), (b).  There is no indication that Congress gave these questions any consideration in 2010.  For the Court to conclude that Congress impliedly amended the law in this fundamental respect without further evidence of affirmative congressional intent—or an irreconcilable conflict—would short circuit the legislative process.

Accordingly, the Court concludes that Plaintiffs are likely to succeed on the merits of their statutory interpretation claim.

### B.      *Plaintiffs' Regulatory Flexibility Act Claim*

Plaintiffs also argue that they are likely to succeed on the merits of their Regulatory Flexibility Act claim.  The Regulatory Flexibility Act ("RFA") "obliges federal agencies to assess the impact of their regulations on small businesses."  *U.S. Cellular Corp. v. FCC*, 254

F.3d 78, 88 (D.C. Cir. 2001).  At the final rulemaking stage, the RFA requires an agency to prepare a "final regulatory flexibility analysis" that contains, among other things, "a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis," as well as the agency's assessment of those issues and a statement of changes made as a result of public comments.  5 U.S.C. § 604(a).  The analysis must also contain "a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes," including an explanation why the agency chose the final rule rather than potential alternatives.  *Id.*  If the Court finds that the Interior Department failed to comply with the RFA, it "shall order the agency to take corrective action" that may include "remanding the rule to the agency" or "deferring the enforcement of the rule against small entities."  5 U.S.C. § 611(a)(4).

Plaintiffs allege that the Interior Department impermissibly relied on the same 2010 "initial regulatory flexibility analysis" ("IRFA") for the 2015 Rule that it had for the 2012 Rule. Dkt. 28-1 at 31.  According to Plaintiffs, this prevented the Department from considering alternatives tailored to the changed circumstances in the reptile breeding industry after the 2012 Rule took effect—circumstances that put more pressure on reptile breeders.  Pointing to the Interior Department's decision not to list the boa constrictor, they suggest that the Department might have fashioned a combination of "state/federal cooperation, state regulation, and private initiatives as an alternative to listing" the four snakes in the 2015 Rule.  *Id.* at 34.   Plaintiffs also assert that the Department failed to consider extending the effective date of the 2015 Rule beyond the 30-day period mandated by the Administrative Procedure Act, apparently implying that the Interior Department might have done so had it issued and taken comments on a new initial regulatory flexibility analysis after the 2012 Rule took effect.  *Id.*

According to Defendants, Plaintiffs' challenge is "invalid" because it turns on the

sufficiency of the IRFA used for the 2015 Rule, and IRFAs are not subject to the judicial review provisions of the RFA. Dkt. 32 at 25. The IRFA requirement is codified at 5 U.S.C. § 603. *See* 5 U.S.C. § 603 ("[w]henever an agency is required . . . to publish general notice of proposed rulemaking . . . the agency shall prepare and make available for public comment an initial regulatory flexibility analysis"). The RFA's judicial review provision, 5 U.S.C. § 611, however, authorizes suits for review of "agency compliance" only with "the requirements of sections 601, 604, 605(b), 608(b), and 610"—not suits to review compliance with § 603. *See Allied Local & Regional Mfrs. Caucus v. EPA*, 215 F.3d 61, 79 (D.C. Cir. 2000) ("We are without jurisdiction to consider . . . challenges to EPA's compliance with the initial regulatory flexibility analysis").

In response, Plaintiffs re-cast their RFA argument as a challenge to the *final* regulatory flexibility analysis ("FRFA"). *See* 5 U.S.C. § 611(a) (authorizing suits to challenge compliance with "section 604," which governs FRFAs). They claim the FRFA was deficient because it did not "demonstrate[] the agency's good faith engagement with the small business regulated community" regarding the proposed 2015 Rule. Dkt. 36 at 14; *see also id.* at 15-16 (alternatives considered in the FRFA were "not shared with the public in advance of the 2015 rule"; FWS did not "make any effort to present to the public . . . their analysis of the state of the large constrictor industry *circa* 2014" or "the impact [FWS] expected their proposal to have on the much-diminished large constrictor snake industry *circa* 2014"). As a result of these alleged failures to present information to the public before the final 2015 Rule was published, Plaintiffs were allegedly unable to provide informed comments regarding the Department's RFA analysis.

These allegations all boil down to objections to the fact that the Department re-used its 2010 IRFA rather than publishing a new IRFA that would have more fully advised interested entities about the data and alternatives the Department was considering in 2014. And § 611 makes clear that challenges to the adequacy of an IRFA are not reviewable. The statute does not

only omit § 603 from the list of enumerated provisions subject to review.  5 U.S.C. § 611.  It also

expressly allows that compliance with certain otherwise unreviewable provisions may be

reviewed "in connection with judicial review of section 604"—which is what Plaintiffs

effectively seek here—and conspicuously leaves § 603 off that list as well.  *Id.* ("Agency

compliance with section 607 and 609(a) shall be judicially reviewable in connection with judicial

review of section 604.").  If Congress had intended to permit plaintiffs to piggyback challenges

to the adequacy of IRFAs under § 603 on reviewable claims under § 604, it knew exactly how to

do so.  It chose not to.  Although Plaintiffs have challenged the sufficiency of the 2010 IRFA as

applied to the 2015 Rule, they have not shown that the Interior Department failed to "respond to

significant points raised during the public comment period" or "consider significant alternatives"

in its final Rule.  *Allied Local*, 215 F.3d at 80.  Because this Court "has no jurisdiction to review

challenges to an agency's compliance with" the IRFA requirement, *Nat'l Ass'n of Home*

*Builders*, 682 F.3d at 1041 (quotation marks omitted), Plaintiffs are unlikely to succeed on the

merits of their claim under the Regulatory Flexibility Act.

## II.    Irreparable Injury

Plaintiffs assert that they (or members of USARK) will suffer several types of irreparable

injury if the 2015 Rule goes into effect.  Plaintiffs submitted several declarations from owners of

reptile breeding businesses stating that the viability of their businesses will be jeopardized by the

2015 Rule.  *See* Decl. of Jay Brewer (Pls.' Ex. D) ¶ 14 ("To be expected to" shift from

reticulated python breeding "under the current guidelines, with less than 30 days to prepare,

would be impossible and would effectively result in the bankrupting of a successful business I've

spent the past three decades building"); Decl. of Kevin McCurley (Pls.' Ex. G) ¶¶ 9, 22 ("The

rule . . . will cause me ruinous economic injury. . . . I will no longer derive a considerable source

of my income from these species and feel it is unlikely my business can and will survive.");

Decl. of Kristopher Brown (Pls.' Ex. H) ¶ 28 ("If this regulation stays in place, our family will be looking for a new means of support and the company . . . will cease to exist in a very short amount of time."); Decl. of Ryan Parker (Pls.' Ex. J) ¶ 11 ("I will not be able to support my family or my employee if this rule remains in place").  They also submitted declarations explaining that the then-looming April 9 deadline rendered snakes subject to the 2015 Rule virtually unsaleable, as breeders rushed to dispose of large numbers of snakes and buyers withdraw from the market.  *See, e.g.*, Decl. of Jay Brewer (Pls.' Ex. D) ¶ 21 ("on March 5, 2015, when news of the addition of the Reticulated Pythons to the Lacy Act broke . . . we had virtually all of our high end sales dissolve in a matter of moments"); McCurley Decl. ¶¶ 11, 21 ("There is absolutely no way I can place, liquidate, or effectively accomplish the movement of my breeding and educational stocks in just thirty days. . . .  How can I possibly find people, zoos and educators to take these animals while there is an incredible influx of other keepers, breeders and educators scrambling to rehome their snakes, too?"); Brown Decl. ¶ 20 ("[C]ustomers are backing out of the payment plans, and canceling the pre-orders.")

Many of Plaintiffs' declarants allege that the 2015 Rule forces them to make a difficult choice between paying for the upkeep of snakes that cannot be sold or euthanizing them.  *See, e.g.*, Declaration of Lynlee Renick (Pls.' Ex. F) ¶¶ 8, 10 ("The volume of reticulated pythons and green anacondas that we have . . . is a burden that even we, as a financially stable company, will have trouble supporting and caring for. . . .  [W]e may be faced with the heartbreaking decision to euthanize these wonderful animals."); Brown Decl. ¶ 16 ("Without the income derived from selling the animals['] offspring or future breeding potential offspring, there is no way we can afford to devote the time and resources to properly house, feed, and care for these animals."); Declaration of Navarone Garibaldi (Pls.' Ex. E) ¶¶ 7-9 ("I am deeply afraid I will not be able to sell all of the babies [in a clutch of eggs] in just one state alone, and I cannot care for all of them

indefinitely on my own.  What can I do?  Euthanize them?").

Defendants argue that Plaintiffs' declarations are insufficient to establish irreparable harm, for several reasons.  First, they argue that Plaintiffs' declarations fail to assert irreparable economic harms.  As Defendants note, economic harm in itself is generally not "irreparable"; there are exceptions, however, when the harm "threatens the very existence of the movant's business," *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam), or where economic losses are "certain, imminent, and unrecoverable," *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 53 (D.D.C. 2011).[8]  Defendants maintain that snake owners had ample time to prepare for the regulation to take effect, but they do not dispute that the 2015 Rule was published only 30 days before its effective date.  Dkt. 32 at 31-32.  Even if Plaintiffs might have had reasons to suspect for many years that the Department would issue a final rule listing the species at issue here, it appears at this juncture that Plaintiffs were justified in continuing business operations until the Rule was actually promulgated.

Defendants also claim that Plaintiffs' asserted economic harms are too indirect to satisfy the irreparable harm standard.  *Id.* at 32 (citing *Am. Meat Inst. v. Dep't of Agric.*, 968 F. Supp. 2d 38, 81 (D.D.C. 2013), *aff'd*, 746 F.3d 1065, *reinstated in relevant part by* 760 F.3d 18 (en banc)).  There is an important difference, however, between the harms alleged by declarants here and the speculation about "independent market variables" that the court in *American Meat Institute* found insufficient to establish irreparable harm.  968 F. Supp. 2d at 81.  Although the meat suppliers in that case expressed concern that a new labeling requirement *might* reduce future demand for their products among meatpackers and consumers, several declarants here have stated that the impending effective date for the 2015 Rule has *already* resulted in lost sales.

---

[8] Another line of district court cases finds irreparable harm where unrecoverable losses are "serious."  *Mylan Pharms. v. Shalala*, 81 F. Supp. 2d 30, 42 (D.D.C. 2000) (quotation marks omitted).

*See, e.g.*, Brewer Decl. ¶ 21; Brown Decl. ¶ 20.  Moreover, it would defy logic if an interstate

transportation ban did not significantly reduce sales for declarants like Kevin McCurley (*see*

McCurley Decl. ¶ 3 ("only 1% of my Reticulated business has been from within my state of New

Hampshire")) or Kristopher Brown (*see* Brown Decl. ¶ 11 ("Our home state of Wisconsin sales

do not even account for 1% of our gross sales.")).  For similar reasons, the harm alleged by

breeder declarants in this case is distinguishable from that alleged by safari outfitters in *Safari*

*Club International v. Jewell*, 47 F. Supp. 3d 29, 37 (D.D.C. 2014).  There, outfitters claimed that

they "*may* suffer economic losses if hunters cancel expeditions" in response to an elephant

trophy ban, but did not allege that they had *actually* suffered losses at the time of the suit.  *Id.*[9]

Defendants' suggestions that international sales might sustain the businesses of some

declarants (who live in states with authorized ports), or that declarants might sell to permitted

scientific or educational purchasers, do show that the 2015 Rule will not entirely wipe out the

market for listed species in the United States.  *See* Dkt. 32 at 32-33.  Still, even in light of these

potential alternatives, Plaintiffs' declarations demonstrate that breeders who substantially rely on

the listed species for their livelihoods are likely to suffer serious economic losses if the 2015

Rule takes effect.  Because those breeders will have no recourse against the government (or

anyone else) to recoup those significant losses in the event they prevail on the merits in this

action, these losses constitute irreparable harm.  *See Mylan Pharms.*, 81 F. Supp. 2d at 42.

Defendants also argue that Plaintiffs' declarants have provided insufficient evidence to

establish that their businesses will be put in jeopardy if the 2015 Rule takes effect.  It is true that

some of the declarants who now allege significant risks to their business were able to survive

---

[9] These cases do suggest, however, that the harms asserted by declarants whose businesses rely
on the reptile breeding industry generally are not tied directly enough to the 2015 Rule to be
considered here.  *See* Declaration of Bob Ashley (Pls.' Ex. K) (president of association of reptile
breeder trade shows); Declaration of Mark Daniel Krull, Jr. (Pls.' Ex. L) (owner of "biotextiles"
company that purchases shed skins of captive snakes).

implementation of the 2012 Rule, which, among other things, prohibited interstate transportation of the Burmese python. *See, e.g.*, McCurley Decl. ¶ 5; Brewer Decl. ¶10.  The fact that a business survived a ban on interstate transportation of one popular species, though, does not mean it would survive another.  Kevin McCurley, for example, alleged that losses associated with the 2012 Rule were "crippling to [his] business."  McCurley Decl. ¶ 5.  The Court understands that risks to businesses may be easily overstated, but it does not appear far-fetched to suggest that some businesses that rely heavily on interstate trade in newly listed species face an existential threat.

Defendants' contention that declarants have failed to provide detailed proof—such as a "projection of anticipated future losses" tied to "an accounting of the company's current assets" (*Am. Meat. Inst.*, 968 F. Supp. 2d at 78)—is well taken.  Some of Plaintiffs' declarants provide specific facts about the proportion of their business dedicated to listed species and the proportion of their sales that require interstate transportation of snakes, and these facts seem to support the contention that the 2015 Rule jeopardizes at least some reptile breeders' businesses.  Still, if the Court based its irreparable harm determination solely on the averred threat to the continued existence of Plaintiffs' businesses, it is not clear that these statements would provide enough specificity to warrant preliminary relief.  In light of the other basis for finding irreparable economic injury, however—that Plaintiffs' declarants have identified losses that are imminent, serious and unrecoverable—this potential defect does not defeat Plaintiffs' showing of irreparable injury.

Finally, the Court does not accept Defendants' contention that Plaintiffs' purported delay in requesting preliminary injunctive relief precludes a finding of irreparable injury.  Plaintiffs filed their application for a temporary restraining order significantly less than one month after the 2015 Rule was published in the Federal Register.  Along with a substantial memorandum of law,

their application attached thirteen declarations that presumably required time to obtain, review and finalize.  Under the circumstances, the Court does not find that Plaintiffs exhibited undue delay in filing the instant application.[10]

### III.    Balance of Equities

The final two factors in the Court's analysis of a request for preliminary relief—the balance of equities and the public interest—"merge" in cases where the relief is sought against the government.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Here, Defendants assert two countervailing interests that must be weighed against Plaintiffs' showing of irreparable harm: harm to the environment, and economic harm to federal, state and local governments.

Defendants' showing of potential environmental harm is serious and credible.  As stated in the Declaration of Jeffrey L. Underwood (Dkt. 32-1), the Department's decision to list the four species at issue in the 2015 Rule reflects careful consideration of several factors affecting the environmental threat posed to each species, including "[t]he likelihood of release or escape," "[p]otential to survive, become established, and spread," and impacts on wildlife resources, ecosystems, threatened and endangered species, and humans and human activities.  *Id.* ¶ 11.  The most significant environmental impact of the four listed snakes (if populations were established in the wild) is direct predation:  They are all "generalist predators" that would consume a wide variety of other animal species.  *Id.* ¶ 12.  Reticulated pythons and green anacondas pose special threats.  They are both among the largest snake species in the world; indeed, if green anacondas became established in the United States, they would rank with certain bears among the largest predators in this Country.  *Id.* ¶¶ 14-15.  Native species have "no experience defending against"

---

[10]  The Court notes, however, that Plaintiffs have not submitted any evidence demonstrating that a prohibition on shipments to Florida or Texas of the listed species would cause any irreparable injury.  As explained below, this fact may affect the balance of equities in at least a limited context.

these "novel, giant predator[s]."  *Id.* ¶ 14.  These snake species also pose indirect threats to other animal species.  For example, reticulated pythons can carry ticks that can transmit diseases to livestock and wild hoofed animals.  *Id.* ¶ 28.

The reticulated python and green anaconda also have the potential to become established as invasive species in some parts of the country.  Reticulated pythons have a history of escaping captivity and the disquieting capacity to reproduce parthenogenically.  *Id.* ¶ 14.  Although Defendants appear to agree with Plaintiffs that most of the continental United States is too cold to sustain populations of reticulated pythons or green anacondas, both species could survive in at least parts of Florida and Texas.  *Id.* ¶¶ 14-15.  Indeed, the Underwood Declaration asserts that green anacondas have "already been found in the wild in Florida."  *Id.* ¶ 15.[11]  And once established in the wild, it would be "extremely difficult, if not impossible, to eradicate" any of the four species listed in the 2015 Rule because "all four species are cryptically colored and blend in with their surroundings; have low profiles; can hide in thick brush, trees, or in water; and are frequently inactive [and] thus undetectable."  *Id.* ¶ 27.

The Department of the Interior's evaluation of the threat posed by the reticulated python and green anaconda is understandably informed by its experience with the Burmese python. According to the Underwood Declaration, Burmese pythons are "becoming the top predators in the Everglades."  *Id.* ¶ 19.  Burmese pythons have accomplished a staggering depletion of native wildlife species in that region, and the Underwood Declaration predicts that "[t]he presence of two or more of the large nonnative constrictor species would be expected to have increasing cumulative negative effects on native wildlife."  *Id.*  These impacts include both direct and

---

[11]  No declarant for Plaintiffs has asserted a cognizable interest in delaying the listing of the other two species addressed in the 2015 Rule—the Beni anaconda and the DeSchauensee's anaconda. Because the Court will therefore not issue preliminary relief as to these species, it does not consider their potential environmental impact in its evaluation of the balance of equities.

indirect threats to endangered and threatened native species, at least thirty of which would be jeopardized by introductions of the listed snakes in Florida. *Id.* ¶ 21.  Snakes of the listed species are thus "likely to escape from captivity or be released into the wild"; are "likely to survive, become established, and spread" if released in a suitable habitat; are "likely to prey on and compete with native species for food and habitat"; are "likely to be disease vectors for livestock and native wildlife"; "cannot be easily eradicated"; and are "likely to disturb ecosystems beyond the point of recoverability." *Id.* ¶ 30.

According to Defendants' declarant, moreover, the Defendant's interpretation of the Lacey Act is an essential tool in preventing the spread of these species within the United States. The Underwood Declaration states that the "pet and hobby trade" is the "primary pathway for these constrictor snakes to cross State lines and be introduced into new areas of the United States." *Id.* ¶ 23.  And hobbyists and pet owners are more likely to experience accidental escapes than are zoos or research institutions. *Id.* ¶ 24.  The Interior Department's interpretation of the statute would prohibit transportation of these snakes from other states into regions where their release might lead to the emergence of an invasive population.  Because the listed species "pose significant risks to native wildlife and native ecosystems," the Underwood Declaration states that implementation of the 2015 Rule is "essential":  "Any delay in the implementation of prohibitions on importation and interstate transport of these injurious species will increase risks to native species and natural ecosystems." *Id.* ¶ 33.

The economic harms Defendants assert flow from these environmental harms.  They claim that federal, state and local governments spend an average of nearly $600,000 per year to prevent or reduce the spread of invasive constrictor species, apparently focused in South Florida. Dkt. 32 at 41-42.  Defendants reason that if a delay in implementation of the 2015 Rule allows any of the listed species at issue to become established in the wild, governments at all levels will

have to expend substantial resources to control these new invasive populations.

Finally, one issue that is not fully addressed in the briefs is the extent to which shipments into Florida and Texas—the two states in which reticulated pythons and green anacondas are most likely to survive in the wild—might be restricted by effect of 16 U.S.C. § 3372(a). That statute prohibits the interstate transportation of animals "taken, possessed, transported, or sold" in violation of state or federal law. *Id.* The potential harm to the public interest would be substantially ameliorated if Defendants could invoke § 3372 to impose criminal liability for shipments of listed snakes into the states where the emergence of an invasive population is most probable. Alternatively, the harm to the public interest might be minimized by limiting the scope of any injunction to reach only shipments to States other than Florida and Texas. Plaintiffs, moreover, have not demonstrated that they have any particular need to ship reticulated pythons or green anacondas to Florida and Texas. *See* note 10, *supra*.

In sum, the potential for a new invasive constrictor species becoming established in any part of the United States is an extremely serious threat to the public interest—much more serious than any of the private harms asserted by Plaintiffs. The five-year period between the promulgation of the proposed rule listing the four species at issue here and the final 2015 Rule does cast some doubt on the threat that a delay of additional weeks or months poses to the public interest. *Cf.* Dkt. 32 at 36 (arguing that "a delay in filing for an injunction by a month . . . despite knowing for months or even, as here, year, that the alleged harmful action was likely and imminent, militates against injunctive relief"). But even though the harms Plaintiffs assert are more certain to come to pass than the risks identified by the government, the severity of the potential public harms here is great enough that the public interest and balance of equities favor Defendants. The balance, however, would likely favor Plaintiffs if shipments of the listed snakes were not permitted to Florida or Texas.

### IV.      Weighing the Elements of the Preliminary Injunction Standard

The Court has concluded that, although the question is close, Plaintiffs have demonstrated a likelihood of success on the merits.  They have also shown that they will suffer at least some substantial irreparable harm if their request for injunctive relief is denied.  In light of the gravity of the threat of a new invasive constrictor species becoming established, however, the balance of equities and public interest factors favor Defendants, at least to the extent shipments of the listed snakes to Florida and Texas are permitted.  Under these circumstances, Plaintiffs have demonstrated that they are entitled to injunctive relief at least with respect to interstate transportation of reticulated pythons and green anacondas into at least the 47 states in which those snakes are unlikely to establish wild invasive populations.

The Court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction," *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982), and "narrowly tailor[]" the relief "to remedy the specific harm shown," *Neb. Dep't of Health & Human Servs.*, 435 F.3d at 330.  Accordingly, on or before 5:00 PM on May 15, 2015, the parties are directed to submit supplemental briefs of not more than seven pages addressing two questions:  first, whether it is necessary or appropriate for the Court to exclude transportation of reticulated pythons and green anacondas into Florida and Texas from the scope of its injunction; and second, whether a stay of the preliminary injunction is appropriate to allow Defendants an opportunity to seek interim relief from the Court of Appeals.  The parties shall then appear for a status conference on May 18, 2015 at 10:00 AM.  The Court will enter an appropriate injunction after reviewing the parties' submissions and hearing from the parties.

### CONCLUSION

Plaintiffs' motion for a preliminary injunction will be **GRANTED** in part.  The Court will enter an appropriate preliminary injunction after hearing from the parties on the scope of the

injunction and whether the injunction should be stayed for any period of time pending review in

the Court of Appeals.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  May 12, 2015